# United States Court of Appeals for the Federal Circuit

---

**TIP TOP CONSTRUCTION, INC.,**
*Appellant,*

**v.**

**PATRICK R. DONAHOE, POSTMASTER GENERAL,**
*Appellee.*

---

2011-1509

---

Appeal from the Postal Service Board of Contract Appeals in no. 6351, Administrative Judge Norman D. Menegat.

---

Decided: September 19, 2012

---

MICHAEL A. GORDON, Michael A. Gordon, PLLC, of Washington, DC, argued for the appellant.

DAVID A. HARRINGTON, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and BRYANT G. SNEE, Deputy Director.

---

Before RADER, *Chief Judge*, MAYER, and SCHALL, *Circuit Judges*.

SCHALL, *Circuit Judge*.

Tip Top Construction, Inc. ("Tip Top") appeals the final decision of the Postal Service Board of Contract Appeals ("PSBCA" or "Board") granting-in-part and denying-in-part Tip Top's appeal under the Contract Disputes Act of 1978, as amended ("CDA"), 41 U.S.C. §§ 7101–7109. *Tip Top Constr., Inc.*, PSBCA No. 6351, 11-1 B.C.A. ¶ 34,726, 2011 WL 1226107 (Apr. 1, 2011) ("*Board Decision*"). In its decision, the PSBCA ruled that Tip Top was entitled to recover $2,565 of the $12,400 it claimed as an equitable adjustment resulting from a change order under its indefinite quantity job order contract with the Postal Service for renovation and alteration of postal facilities in the U.S. Virgin Islands (the "contract"). *Id.*, slip op. at 16. The Board ruled that Tip Top was not entitled to recover the balance of the amount claimed, $9,835, because it had failed to demonstrate that the costs at issue were incurred as a result of the change order. *Id.*, slip op. at 17. Because we conclude that this latter ruling by the Board was based upon an error of law and not supported by substantial evidence, we reverse and remand the case to the Board with the instruction that it grant Tip Top's appeal in its entirety.

## BACKGROUND

### I.

The Postal Service awarded the contract to Tip Top on July 26, 2007. *Id.*, slip op. at 2, ¶ 1. The contract contemplated that from time to time the Postal Service would assign Tip Top individual projects by issuing work orders. *Id.*

The contract specified a procedure for the issuance of a work order. *Id.*, slip op. at 2–3, ¶ 3. First, the Postal Service and Tip Top would hold a Joint Scope Meeting, at which the Postal Service would explain to Tip Top the work it wished to have done and Tip Top could provide input. Next, the Postal Service would prepare a "Detailed Scope of Work," on which Tip Top would base its proposal for the work. The proposal would be a lump-sum fixed-price proposal which would be contained in a "Price Proposal Package" which Tip Top would present to the Postal Service. If the Postal Service accepted Tip Top's Price Proposal Package, it would issue a work order for the project. *Id.*, slip op. at 3–4, ¶ 5. Contract Clause B.309 stated, "The contractor shall not recover any costs arising out of or related to the development of the work order including but not limited to the costs to review the Detailed Scope of Work or prepare a Price Proposal Package . . . ." Contract Clause B.309, Work Order (Clause F-302) (March 2006), subsection I. The contract also contained a changes clause. *See* Contract Clause B.1006, Changes (Construction) (Clause B-37) (March 2006) Modified, subsections a,c.

On May 26, 2009, the Postal Service issued Tip Top a work order to replace the air conditioning system at the Main Post Office in Christiansted, Virgin Islands, for the price of $229,736.92. Subsequently, on July 26, 2009, Tip Top sent the Postal Service's construction manager, Victor Morales, its mechanical subcontractor's submittals. The subcontractor planned to install Carrier Air Cooled Condensers Model 09DK020 and a Carrier Air Cooled Indoor Unit Air Handler Model 05BV024. The proposed condensers could be used with refrigerants R-12, R-22, R-500, and R-134a; the proposed air handler could be used with refrigerants R-22 and R-410a. The equipment submittals did not identify the refrigerant Tip Top planned to use.

The Postal Service's construction manager approved the submittals, and based on that approval, Tip Top's mechanical subcontractor ordered the listed equipment and associated fittings and piping.

In September of 2009, Tip Top sent its submittal for the system refrigerant to Mr. Morales. In the submittal Tip Top stated that it planned to use R-22 refrigerant. On September 18, 2009, Mr. Morales returned the submittal to Tip Top marked "Reviewed, no exceptions taken." Later that same day, however, Mr. Morales emailed Tip Top stating that Tip Top should ignore the previous approval and that R-410a refrigerant should be used in the system. A week later, Ivan Diaz, Tip Top's consultant for the project, responded that the equipment previously ordered from Carrier Corp. ("Carrier") was only available with R-22 refrigerant and that a change in equipment would involve additional cost and penalties estimated at $20,000. Mr. Diaz asked how Tip Top should proceed. Mr. Morales responded on September 28, 2009, asking Tip Top to submit a proposal to furnish and install air conditioning equipment that used R-410a refrigerant.

During the period September 18 through October 13, 2009, Mr. Diaz assisted Tip Top in negotiating the required change with its mechanical subcontractor and Carrier. On October 13th, Tip Top submitted to the Postal Service specifications for air conditioning equipment that used R-410a refrigerant.

The submittal was approved by the Postal Service on October 15, 2009. Shortly thereafter, on October 19, 2009, Tip Top, through Mr. Diaz, submitted a proposal in the amount of $28,838.43 for additional costs associated with changing the air conditioning system from one using R-22 refrigerant to one using R-410a refrigerant.

In early November 2009, Robert Manka, the Postal Service's contracting officer, orally instructed Tip Top to proceed with the change in refrigerant. Subsequently, on January 12, 2010, Mr. Manka directed Tip Top in writing to proceed with the change in equipment from a system using R-22 refrigerant to one using R-410a refrigerant. Mr. Manka's letter stated in pertinent part as follows:

> Tip Top Construction is hereby directed to proceed with the equipment refrigerant change from R22 to R410a as detailed in the scope-of-work provided by Mr. Ivan Diaz in his letter dated October 19, 2009 to . . . Project Manager Victor Morales for a price to be determined later but not to exceed $28,838.43.

During the period between September of 2009 and June of 2010, Tip Top and the Postal Service discussed pricing of the changed work. Until March 8, 2010, Mr. Diaz conducted the negotiations on behalf of Tip Top. From that point on, Percy Hollins, Tip Top's president, conducted the negotiations.

The critical issue in the negotiations was whether Tip Top was entitled to recover the costs it incurred in preparing the $28,838.43 estimate that Mr. Diaz submitted to Mr. Morales on October 18, 2009. On April 8, 2010, Mr. Manka sought guidance within the Postal Service on this issue, writing "If one of our JOC Contractor firms hires a firm to do their cost estimating for proposals and modifications is the cost . . . considered an overhead charge or does it become a direct or indirect billable cost?" After receiving an answer to his inquiry, Mr. Manka sent an email to Mr. Hollins on April 16, 2010, quoting to Mr. Hollins the advice which he had been given: "The cost is an overhead charge and is not a billable cost. We recommend you review contract clause F-302 titled Work Order

subparagraph I, in the associated contract which provides specific discussion on processing work orders." Notably, the advice Mr. Manka received and which he passed on to Mr. Hollins only addressed Mr. Manka's question insofar as it related to cost estimating for work orders. It did not address his question insofar as it related to cost estimating for modifications under the contract's changes clause. Beginning in April of 2010, counsel advised Mr. Hollins and assisted him in his continuing negotiations with the Postal Service.

Negotiations between Tip Top and the Postal Service ended on June 18, 2010. That day, Mr. Hollins wrote Mr. Manka, stating, "Tip Top . . . has reviewed the Postal Services' responses dated April 16, 2010, April 23, 2010, and June 8, 2010 to our emails with outside counsel and do not consider your position substantially justified." Mr. Hollins wrote that Tip Top therefore was submitting "a claim and request for an equitable adjustment under the Contract Disputes Act." Tip Top's claim was in the total amount of $34,553.77. This was comprised of (i) Tip Top's subcontractor's price for the change (in the amount of $18,757.43, plus 10% profit, 4% insurance, and 4% gross receipts tax, for a subtotal of $22,133.77); (ii) $9,655 for "Preparation Costs & Extended Overhead; and (iii) $2,745 for "Legal Fees."

On June 23, 2010, Mr. Manka issued a contracting officer's final decision in which he granted Tip Top an equitable adjustment in the amount of $22,133.77. He denied the balance of the claim, in the amount of $12,400. Mr. Manka based his partial denial of Tip Top's claim on two considerations. First, he concluded that the proposal preparation costs were barred by Contract Clause B.309. As noted above, that clause provides that contractor's costs in connection with work orders are not recoverable. Second, he concluded that it was unreasonable for Tip Top

to spend $6,704.66 to prepare a change order valued at only $22,133.77.

## II.

Tip Top appealed the contracting officer's final decision to the PSBCA, seeking to recover $12,400, the amount of its claim which Mr. Manka had denied. In its appeal, Tip Top elected to proceed under the Board's accelerated procedure, which is available in the case of a claim of less than $50,000. *See* 39 C.F.R. § 955.13. Under that procedure, the Board decides an appeal on the record without an oral hearing. *See id.* § 955.12.

On April 1, 2011, the PSBCA issued its decision on Tip Top's appeal. The Board ruled that Tip Top was entitled to recover $2,565 for costs incurred by Tip Top's consultant, Mr. Diaz, through October 15, 2009. That was the day on which Mr. Morales, on behalf of the Postal Service, accepted Tip Top's equipment proposal for an air conditioning system using R-410a refrigerant. *Board Decision*, slip op. at 7–8, ¶ 20, 16. The Postal Service had urged that the provision in Contract Clause B.309 barred recovery of the costs Tip Top sought. The Board rejected this argument. The Board stated that Clause B.309 did not apply to Tip Top's claim because the clause only barred recovery of contractor costs incurred in reviewing a Detailed Scope of Work. This, the Board stated, was "a process exclusive to award of the original work order." *Id.*, slip op. at 11. The Board continued that it was the changes clause of the contract that governed Tip Top's claim for an equitable adjustment resulting from the Postal Service's change order. The Board ruled that Tip Top had met the requirements for recovery under this clause as far as the $2,565 in costs relating to Mr. Diaz's work prior to October 15, 2009 were concerned. The Board stated that the costs were compensable because

they represented "an increase in [Tip Top's] direct cost of performance due to the change." *Id.*, slip op. at 16.

The PSBCA also ruled, however, that Tip Top was not entitled to recover the balance of its claim, in the amount of $9,835. This amount consisted of Mr. Diaz's fees and overhead costs after October 15, 2009, until he left the job in March of 2010. It also consisted of legal fees in the amount of $2,745 for work done during the period April 21 through June 8, 2010. In denying recovery of this part of Tip Top's claim, the Board stated that the negotiations between Tip Top and the Postal Service after October 15, 2009, relating to recovery of Tip Top's estimating costs, which resulted in work by Mr. Diaz and outside counsel, "had nothing to do with performance of the changed work or genuine contract administration and were solely directed at trying to convince the contracting officer to accept [Tip Top's] figure for the change and maximizing [Tip Top's] monetary recovery." *Id.*, slip op. at 18. The Board concluded: "[O]nce the substitute equipment was approved, nothing remained to be negotiated except the price. There is no evidence that the parties' negotiations addressed an extended delivery schedule or any other changes to contract performance requirements." *Id.*, slip op. at 18–19. The Board also found that Tip Top had not adequately documented Mr. Diaz's charges, stating, "As the consultant likely was working on other project matters, it was incumbent upon [Tip Top] to identify hours, if any, spent on the equipment change issue, and it has not done so." *Id.*, slip op. at 17.

Tip Top has timely appealed the PSBCA's decision. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

DISCUSSION

I.

We review appeals from the PSBCA under the standard set forth in 41 U.S.C. § 7107(b):

(1) [T]he decision of the agency board on a question of law is not final or conclusive; but

(2) the decision of the agency board on a question of fact is final and conclusive and may not be set aside unless the decision is--

(A) fraudulent, arbitrary, or capricious;

(B) so grossly erroneous as to necessarily imply bad faith; or

(C) not supported by substantial evidence.

II.

Tip Top first contends that the Board committed legal error by holding that its consultant and attorney costs associated with the negotiations relating to the price of the changed work were not recoverable. That holding, Tip Top argues, conflicts with this court's holding in *Bill Strong Enterprises, Inc. v. Shannon*, 49 F.3d 1541 (Fed. Cir. 1995). Appellant's Br. 19–22. There, we held that, under the Federal Acquisition Regulation ("FAR"), consultant costs incurred by a contractor in connection with negotiations relating to the additional compensation to which the contractor was entitled by reason of government-caused delay of the job were allowable as contract administration costs, even though the negotiations eventually failed. *Bill Strong*, 49 F.3d at 1550. Thus, Tip Top urges, the consultant and legal fees it incurred in negotiating the price of the change order are recoverable as contract administration costs. The fact that the contract

at issue is not governed by the FAR is irrelevant, Tip Top claims, because the contract is governed by a changes clause which is substantially similar to the standard changes clause in the FAR.[1] Appellant's Reply Br. 5.

Tip Top also argues that the Board's finding of insufficient evidence supporting certain consultant costs was not supported by substantial evidence. Specifically, Tip Top takes issue with the Board's treatment of Mr. Diaz's fees after October 15, 2009, when the substitute equipment was approved. Tip Top contends that it provided ample support for those costs in the form of Mr. Diaz's timesheets and declarations from Mr. Diaz and Mr. Hollins. Appellant's Br. 15–19. Noting that this evidence was unrebutted, Tip Top argues that the Board's finding that Mr. Diaz was likely working on other matters was based purely on improper speculation. *Id.* at 19.

The government responds by first arguing that Tip Top's attorney fees are not recoverable because costs incurred to prepare and document a claim for equitable adjustment are not recoverable. Appellee's Br. 10. According to the government, the record establishes that Tip Top's attorney fees were incurred in the filing of a claim and thus they are not recoverable. *Id.* at 11–12.

Next, the government contends that Tip Top failed to provide sufficient evidence to support its claim for consultant costs incurred after October 15, 2009. According to the government, the invoices of Mr. Diaz do not provide sufficient detail to determine the type of work he performed. *Id.* at 12–16. The government further argues the declarations provided by Mr. Hollins and Mr. Diaz are after-the-fact and of dubious value. *Id.* Additionally, the

---

[1] Postal Service contracts are not governed by the FAR. *In re Appeal of Kirkpatrick*, PSBCA No. 3832, 96-2 B.C.A. ¶ 28,599, 1996 WL 590751 (Oct. 11, 1996).

government states that Mr. Diaz's costs are unreasonable because of the ratio between his costs and the cost of the change. *Id.* at 16–17.

III.

The PSBCA held that costs incurred after approval of the substitute equipment were not recoverable. As seen, the basis for the Board's holding was its determination that the efforts of Tip Top's consultant after October 15, 2009, and the work of its attorney through June 8, 2010, were "solely directed at trying to convince the contracting officer to accept Appellant's figure for the change and maximizing Appellant's monetary recovery," and therefore "had nothing to do with performance of the changed work or genuine contract administration." *Board Decision*, slip. op. at 18. Thus, the Board reasoned that even though during the period between October 15, 2009, through June 8, 2010, the parties were negotiating the price of the changed work, the negotiations did not relate to contract administration because the Postal Service already had accepted the substitute equipment and because Tip Top was trying to persuade the contracting officer to agree to its price of $28,838.43.

Under the changes clause of the contract, Tip Top was entitled to an equitable adjustment for any increase in its costs due to the change in the refrigerant. *See* Contract Clause B.1006, Changes (Construction) (Clause B-37) (March 2006) Modified, subsections a,c ("If any change under this clause causes an increase or decrease in the supplier's cost of, or the time required for, the performance of any part of the work under the contract, whether or not changed by any order, the contracting officer will make an equitable adjustment and modify the contract in writing."). The question is whether costs arising from negotiations relating to the price of the changed work are

recoverable in this case because they constituted part of the increased costs arising from the change directed by the Postal Service. The government does not appear to dispute that costs associated with general contract administration are recoverable. Indeed, the government acknowledged at oral argument that costs associated with price negotiations are potentially recoverable if the requisite showing is made to the Board. Oral Arg. at 25:23, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/2011-1509/all ("[Costs associated with price negotiation are] potentially recoverable if the requisite showing is made to the Board."). Rather, the government argues that Tip Top's consultant costs and attorney fees are not recoverable because they were incurred in the process of claim preparation. In short, both the PSBCA and the government take the position that reasonable contract administration costs arising in the setting of a change order are recoverable.[2] We do not disagree. It seems to us proper that if a change order requires a contractor to incur contract administration costs, those costs are recoverable to the extent they are reasonable. Thus, the dispute depends on whether the costs are classified as general contract administration costs or claim preparation costs.

Although it involved the recovery of costs under the FAR, our discussion in *Bill Strong* provides guidance on how to classify costs.[3] In *Bill Strong*, a contractor who

---

[2] As seen, the Board allowed recovery of Mr. Diaz's costs incurred up to October 15, 2009, but denied recovery of his costs and the fees of Tip Top's attorney after that date. The Board stated that these latter costs and fees "had nothing to do with performance of the changed work or genuine contract administration . . . ." *Board Decision*, slip. op. at 18.

[3] The government argues that our subsequent ruling in *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir.

was renovating housing units on a military base asserted that it was incurring increased costs because the government was releasing the units for work out of sequence. 49 F.3d at 1542. In response to the contractor's assertion, the government requested cost data and information from the contractor. The contractor, in turn, hired a third-party consulting firm to handle the submission of data to the government. *Id.* at 1543. Eventually the parties reached a settlement agreement. *Id.* The agreement, however, specifically excluded the costs of the third-party consultant's fees, and the parties agreed that the contracting officer would issue a final decision on the recoverability of those fees. *Id.* The contracting officer denied recovery of the fees, stating that the work performed by the third-party consultant was performed after the completion of the contract work and was thus "not incurred in connection with the actual performance of the work." *Id.* at 1543–44.

In deciding the case, we examined the distinction between costs incurred in connection with the administration of a contract and costs incurred in connection with the prosecution of a CDA claim, the former being recoverable, but the latter not. *Id.* at 1549. In analyzing the two types of costs, we observed the following:

> In the practical environment of government contracts, the contractor and the CO usually enter a negotiation stage after the parties recognize a

_____

1995) (en banc) casts doubt upon the discussion of cost classification in *Bill Strong*. In *Reflectone*, we addressed when a claim arises for purposes of the CDA and overruled *Bill Strong* on this point. The discussion in *Bill Strong* regarding whether a particular cost should be classified as either a contract administration cost or a cost incidental to the prosecution of a claim, however, remains good law.

problem regarding the contract. The contractor and the CO labor to settle the problem and avoid litigation. Although there is sometimes an air of adversity in the relationship between the CO and the contractor, their efforts to resolve their differences amicably reflect a mutual desire to achieve a result acceptable to both. This negotiation process often involves requests for information by the CO or Government auditors or both, and, inevitably, this exchange of information involves costs for the contractor. These costs are contract administration costs, which should be allowable since this negotiation process benefits the Government, regardless of whether a settlement is finally reached or whether litigation eventually occurs because the availability of the process increases the likelihood of settlement without litigation. Additionally, contractors would have a greater incentive to negotiate rather than litigate if these costs of contract administration were recoverable.

In classifying a particular cost as either a contract administration cost or a cost incidental to the prosecution of a claim, contracting officers, the Board, and courts should examine the objective reason why the contractor incurred the cost. If a contractor incurred the cost for the genuine purpose of materially furthering the negotiation process, such cost should normally be a contract administration cost allowable under FAR 31.205–33, even if negotiation eventually fails and a CDA claim is later submitted. On the other hand, if a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the Government, then such cost is unallowable under FAR 31.205–33.

*Id.* at 1549–50 (citations omitted). We held that, under this framework, the contractor's consultant costs were recoverable. *Id.* at 1550–51. With the guidance provided in *Bill Strong*, we turn to the present case.

After reviewing the record in light of the discussion in *Bill Strong*, we conclude that the PSBCA erred in holding that the consultant costs and attorney fees which are at issue were not "genuine contract administration costs" because they were "solely directed at . . . maximizing [Tip Top's] monetary recovery." *Board Decision*, slip op. at 17–18. On October 19, 2009, Tip Top submitted its proposal for the additional costs associated with the change. Thereafter, in response to the proposal, the contracting officer, in his January 12, 2010 letter, specifically referred to "a price to be determined later." Subsequently, Tip Top and the Postal Service negotiated over the pricing of the changed work. Through March 8, 2010, Mr. Diaz handled the negotiations on behalf of Tip Top. After that, Mr. Hollins conducted the negotiations for Tip Top. On April 16, 2010, Mr. Manka advised Tip Top by email of the guidance he had received from within the Postal Service as to the recovery of Tip Top's consultant costs. *Id.*, slip op. at 9, ¶ 27. Negotiations then continued with Tip Top assisted by counsel. *Id.*, slip op. at 9, ¶ 28. Tip Top then submitted a claim under the CDA on June 18, 2010. *Id.*, slip op. at 10, ¶ 29. The contracting officer's final decision issued on June 23, 2010. *Id.*, slip op. at 10, ¶ 31.

In our view, both the costs of Mr. Diaz's work between October 15, 2009, and March 8, 2010, and counsel's fees through June 8, 2010, were incurred "for the genuine purpose of materially furthering the negotiation process." *Bill Strong*, 49 F.3d at 1550. The contracting officer, in his letter of January 15, 2010, expressly left open for further negotiation the issue of price. Thereafter, Tip Top and the contracting officer continued to engage in negotia-

tions over the price of the changed work in order to avoid litigation.[4]   Only on June 18, 2010, did negotiations finally end when Tip Top submitted its claim under the CDA.   Simply because the negotiations related to the price of the change does not serve to remove the associated costs from the realm of negotiation and genuine contract administration costs.  Consideration of price is a legitimate part of the change order process.  In holding otherwise, the Board, we believe, erred.

### IV.

Having held that the Board committed legal error, we review whether substantial evidence supports the Board's alternative holding that Tip Top failed to establish its costs for the time period after the substitute equipment was approved.  Based upon the record before us, we find the Board's holding unsupported.

Tip Top provided timesheets for Mr. Diaz's work for the relevant time period.  To the extent more detail was needed, Tip Top submitted declarations from Mr. Diaz and Mr. Hollins describing the work performed by Mr. Diaz.  Additionally, Tip Top submitted attorney billing records to support its claim for attorney fees.  This evidence was unrebutted.  In reviewing the evidence, the Board engaged in speculation that Mr. Diaz was working on other projects, speculation which is not supported by the record.  In view of the evidence before us, we hold that Tip Top adequately supported its costs for the time period after the substitute equipment was approved and that

---

[4]   We see nothing in the record suggesting that either Tip Top or the Postal Service negotiated in other than good faith.  In addition, by only claiming attorney fees incurred through June 8, 2010, Tip Top limited its claim to fees incurred during the negotiation process.

those costs were reasonable in light of the course of the price negotiations.

CONCLUSION

For the foregoing reasons, we reverse the ruling by the Board insofar as it denied-in-part Tip Top's appeal. We remand the case to the Board with the instruction that it grant Tip Top's appeal in its entirety. This means that Tip Top is entitled to recover $9,835 for consultant costs and attorney fees, plus interest to the extent allowed by the CDA.

Appellant shall have its costs.

**REVERSED and REMANDED**