# United States Court of Appeals for the Federal Circuit

---

**SAGE ACQUISITIONS LLC,**
*Appellant*

**v.**

**SECRETARY OF HOUSING AND URBAN DEVELOPMENT,**
*Appellee*

---

2023-1907

---

Appeal from the Civilian Board of Contract Appeals in No. 7319, Administrative Judge Kyle E. Chadwick, Administrative Judge Harold D. Lester, Jr., Administrative Judge Patricia J. Sheridan.

---

Decided: October 18, 2024

---

MICHAEL ROBERT RIZZO, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, CA, argued for appellant. Also represented by DINESH CHRISTOPHER DHARMADASA, AARON RALPH.

JESSICA R. TOPLIN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee. Also represented by BRIAN M. BOYNTON, WILLIAM JAMES GRIMALDI, PATRICIA M. MCCARTHY.

———————————

Before DYK, CHEN, and CUNNINGHAM, *Circuit Judges*.

DYK, *Circuit Judge*.

This case involves contracts between the appellant, Sage Acquisitions LLC ("Sage"), and the United States Department of Housing and Urban Development ("HUD") for management and marketing services. These services were to be provided in connection with properties that had been foreclosed and were subsequently in possession of HUD as part of its Real Estate Owned ("REO") disposition program. Sage is an asset management contractor that was awarded three of these contracts (the "REO Contracts"). Sage filed certified claims with the HUD contracting officer for settlement costs from the termination for convenience of the REO Contracts, equitable adjustments based on the reduction in scope of properties assigned to the REO Contracts, and damages for scope reduction. Sage also sought damages for HUD's alleged breach of: (1) a contractual option provision of the three REO Contracts and (2) a related bridge contract ("Bridge Contract"), covering performance for a period after the REO Contracts were terminated. The Civilian Board of Contract Appeals ("Board") denied relief. We affirm.

BACKGROUND

I

HUD has adopted a single-family mortgage insurance program, which insures approved lenders against the risk of loss on loans for purchases of single-family homes. HUD administers the program through the Federal Housing Administration, which is an organizational unit within the agency. In the typical case, if a debtor of a HUD-insured loan defaults, the property becomes part of HUD's REO portfolio. The property is foreclosed on by the lender and conveyed to HUD, and the lender files a claim for insurance

benefits with HUD. HUD then contracts with asset managers like Sage to manage and market the properties for sale.

HUD also uses alternatives to the REO disposition program that do not involve HUD's acquisition of the properties. Under the Claims Without Conveyance of Title procedure, the lender bids for properties at the foreclosure sale. If the lender is the successful bidder, it may retain the properties and file for insurance benefits or convey the properties to HUD and file for benefits. If a third party is the successful bidder, the lender in certain circumstances can file a claim for insurance benefits. Under the Distressed Asset Stabilization Plan, the insured amount is paid to the lender, notes securing the loans and accompanying liens are transferred to HUD and sold through a competitive bidding process by HUD; foreclosure of the properties is delayed. In some cases, properties can also be sold by homeowners prior to foreclosure through a short sale procedure, with the sale proceeds going to the lender and HUD paying the lender the difference between the sale proceeds and the insured amount.

These alternative approaches do not require asset management contractors. Because these programs save costs and streamline the disposition process, HUD recently increased its use of them. As of 2012, these alternatives comprised about 15–20% of total dispositions. HUD has continued to manage its disposition of its property inventories through a combination of the REO disposition program and REO alternatives.

II

In July 2014, HUD issued a solicitation for REO management and marketing services in twelve distinct geographical areas across the United States. The solicitation indicated that HUD intended to award a single contract in each geographical area as a performance-based,

single-award indefinite-delivery, indefinite-quantity ("IDIQ") contract pursuant to Federal Acquisition Regulation ("FAR") 16.504 and included a listing of each contract region with a corresponding guaranteed minimum of $1,000,000. The solicitation expressly stated that "[t]he minimum guarantee shall serve as full consideration for the Government's liability under this contract." J.A. 259. Additionally, during its Q&A in the solicitation process, HUD clarified that it "makes no representation to future volumes or averages." J.A. 630. HUD awarded the three REO Contracts to Sage on September 25, 2015, for three areas in Denver, Philadelphia, and Atlanta.

Each REO Contract was identified as an IDIQ contract and contained standard clauses associated with IDIQ contracts, including FAR 52.216-22, HUD Acquisition Regulation ("HUDAR") 2452.216-76, and a guaranteed minimum order of $1,000,000. *See* J.A. 657, 777, 785–86.[1]

---

[1]    The contractual provisions stated:

52.216-22 INDEFINITE QUANTITY (OCT 1995) This is an indefinite quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract. . . . The government will order at least the quantity of supplies or services designated in the Schedule as the "minimum."

HUDAR 2452.216-76, Minimum and Maximum Quantities and Amounts for Order (Dec. 2012) The minimum quantity and/or amount to be ordered under this contract shall not be less than the minimum quantity and/or amount shown in the table below. The maximum quantity and/or

Section H.2 of each contract clarified that the minimum guarantee of $1,000,000 would serve as full consideration under the contract and limit the government's liability. *See* J.A. 747–48 ("The minimum guarantee shall serve as full consideration for the Government's liability under this contract, and the Government will be under no obligation to conduct further ordering of services . . . .").

Each contract had a base period of less than one year and provided that the contract "may be extended" for four 12-month option periods, J.A. 738–39, with written task orders to be issued on a "yearly basis." J.A. 663. As a condition of the REO Contracts, the awardee was obligated to incur significant costs during the start-up and ramp-up phases of the contracts, including establishing physical infrastructure, retaining staff, and obtaining subcontract support, among other requirements. *See* J.A. 729–34.

Immediately after the REO Contracts were awarded to Sage, several unsuccessful offerors filed bid protests with the Court of Federal Claims ("Claims Court"), contending that HUD's discussions with the offerors were insufficient under the terms of the solicitation and relevant regulations. *See Q Integrated Cos. v. United States*, 126 Fed. Cl. 124, 127 (2016). On April 20, 2016, the Claims Court agreed and enjoined Sage's performance at the end of Option Period 1. *See id.* at 146, 148. Thereafter, the Claims Court permitted the REO Contracts to remain in effect six months into Option Period 2. *See Q Integrated Cos. v. United States*, 131 Fed. Cl. 125, 134 (2017). Consequently, HUD exercised Option Period 2 for the REO

---

amount to be ordered under this contract shall not exceed the maximum quantity and/or amount shown in the table below.

J.A. 777, 785–86.

Contracts and issued six-month task orders under these contracts on May 31, 2017. On November 30, 2017, HUD also awarded the Bridge Contract to Sage, to be performed after the last order periods under the REO Contracts ended. Unlike the REO Contracts, the Bridge Contract explicitly stated that it was a requirements contract.

In January 2018, HUD terminated the three REO Contracts for convenience. In January 2019, Sage submitted claims to the HUD contracting officer. As to the original REO Contracts, Sage contended that they were requirements contracts, not IDIQ contracts, so it was entitled to recover termination costs. Sage pointed out that although the contracts each included a guaranteed minimum, they also indicated estimated prices far in excess of $1,000,000. *See* J.A. 662 (estimating a contract value of $7,562,406.50 during the base period). These estimates were based on historical sales data, and Sage alleged that it experienced considerably lower inventory numbers once it began performance of the REO Contracts. *See* Appellant's Br. 27; J.A. 2893.

Sage claimed that HUD had constructively changed the REO Contracts by diverting inventory from the REO disposition program to REO alternatives, causing inventories to fall far below the estimated quantities contemplated by the contracts. Sage alternatively claimed that HUD was liable for defective specifications or negligent estimates, failure to disclose superior knowledge, breach of the covenant of good faith and fair dealing, or mutual mistake of fact between the parties. The parties do not dispute that HUD met the guaranteed minimum set forth in the REO Contracts. Nor in general do the parties dispute that if the REO Contracts were IDIQ contracts, Sage could not recover either termination for convenience costs or equitable adjustments after HUD met its guaranteed minimums.

Sage also argued that HUD improperly exercised Option Period 2 of the REO Contracts by issuing a six-month task order, and that HUD breached the Bridge Contract by diverting inventory to REO alternative dispositions. In January 2022, the HUD contracting officer denied Sage's claims, concluding that the REO Contracts were IDIQ contracts; that HUD had satisfied the minimum guarantee of $1,000,000 for each contract; and that HUD had not violated either the options provisions of the REO Contracts or the Bridge Contract.

Sage appealed to the Board. The Board, like the HUD contracting officer, denied each of Sage's claims, holding that the REO Contracts were IDIQ contracts and that Sage was not eligible to receive termination for convenience costs, equitable adjustments, or recover for breach once the guaranteed minimums had been met; that the REO Contracts did not require HUD to issue one-year task orders; and that HUD had no further obligations under the Bridge Contract because Sage knew about HUD's evolving policy positions on the use of REO alternatives when it negotiated and entered into the Bridge Contract. *See Sage Acquisitions LLC v. Dep't of Hous. & Urban Dev.*, CBCA 7319, 23-1 BCA ¶ 38,315 at 186,056–59.

This timely appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

DISCUSSION

This court reviews questions of law, including interpretations of contracts, de novo. *Rockies Express Pipeline LLC v. Salazar*, 730 F.3d 1330, 1335–36 (Fed. Cir. 2013). The determination of contract type is a question of law, "not controlled by a label in the contract." *Maint. Eng'rs v. United States*, 749 F.2d 724, 726 n.3 (Fed. Cir. 1984). We will set aside findings of fact by the Board if they are arbitrary, capricious, or unsupported by substantial

evidence.  41 U.S.C. § 7107(b)(2); *see also Tip Top Constr. Inc. v. Donahoe*, 695 F.3d 1276, 1281 (Fed. Cir. 2012).

## I

Sage first contends that it is entitled to recover because the Board erred in characterizing the REO Contracts as IDIQ contracts rather than requirements contracts.  Sage contends that even though the contracts were identified as IDIQ contracts, provided guaranteed minimums, and did not include clauses required for requirements contracts such as FAR 52.216-21 and HUDAR 2452.216-77, they were in substance requirements contracts because HUD was obligated to provide all REO work to Sage for the geographic areas covered by the contracts.  Sage urges that the plain language of Sections 6.2.1.1 and 6.2.1.2 conferred such exclusivity.  Sections 6.2.1.1 and 6.2.1.2 stated that "all" acquisitions in the contracts' respective geographic areas were covered by the contracts.  *See* J.A. 733.

## A

When interpreting a contract, "[o]ur analysis begins with the language of the written agreement." *Premier Off. Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (citing *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)); *see also C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("A contract is read in accordance with its express terms and the plain meaning thereof.").  "We must interpret [a contract] as a whole and 'in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions.'" *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997) (quoting *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992)).

Our cases have contemplated that indefinite-delivery supply contracts must fit into one of three possible types:

"those for a definite quantity, those for [IDIQ contracts,] and those for requirements." *Ace-Fed. Reps., Inc. v. Barram*, 226 F.3d 1329, 1331 (Fed. Cir. 2000) (quoting *Torncello v. United States*, 681 F.2d 756, 761–62 (Ct. Cl. 1982) (en banc)); *see also* FAR 16.501-2(a). While contracts must fit into one of these three types, "[a] contract is not unenforceable merely because it does not fit neatly into a recognized category." *Ace-Fed. Reps.*, 226 F.3d at 1332.

Both IDIQ contracts and requirements contracts provide the government with flexibility in scheduling deliveries and ordering services on an as-needed basis. The touchstone of a requirements contract is exclusivity—the government must obligate itself to purchase all its needs from the contractor. *See Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 205 (Fed. Cir. 1992) ("[A]n essential element of a requirements contract is the promise by the buyer to purchase the subject matter of the contract exclusively from the seller."). This court has explained that the conferral of exclusivity must be clear from the face of the contract, and the mere inclusion of "terms that suggest exclusivity" is not enough to create a requirements contract. *Coyle's Pest Control, Inc. v. Cuomo*, 154 F.3d 1302, 1305–06 (Fed. Cir. 1998). A requirements contract may also provide a minimum quantity that the government may order under each individual order. *See* FAR 16.503(a)(2).

In contrast, the touchstone of an IDIQ contract is a guaranteed minimum that when fulfilled fully discharges the government's liability. In other words, IDIQ contracts limit the government's obligation to the minimum quantity specified in the contract. *See* FAR 16.504(a)(1); *see also Travel Ctr. v. Barram*, 236 F.3d 1316, 1319 (Fed. Cir. 2001).

B

The REO Contracts stated on their face that they were IDIQ contracts. Section B.1 in each contract, entitled

"CONTRACT DEFINITION – INDEFINITE DELIVERY/INDEFINITE QUANTITY," stated that "[t]his is a performance-based, single award Indefinite Delivery Indefinite Quantity contract as defined in [FAR 16.504]. . . . The contract minimum and maximum quantities available for order are specified in HUDAR 2452.216-76." J.A. 657. The contracts stated that "[t]he minimum guarantee shall serve as full consideration for the Government's liability under this contract[.]" J.A. 747. The language of the REO Contracts unequivocally made clear that the parties entered into IDIQ agreements. *See Varilease Tech. Grp., Inc. v. United States*, 289 F.3d 795, 799 (Fed. Cir. 2002) (explaining that a contractor has "no reasonable basis" to believe that it has entered into a requirements contract when the "language of the contract clearly sets forth the essentials of an [IDIQ] contract").

Sage responds that the REO Contracts cannot be IDIQ contracts because of Sections 6.2.1.1 and 6.2.1.2, which Sage argues conferred exclusivity that would be inconsistent with IDIQ contracts:

6.2.1.1 31st[ ]Day – On the thirty-first (31st) calendar day after the effective date of the contract or at the end of the startup period if extended by the [contracting officer] beyond the 30th day, the Contractor shall begin performance of marketing and sales services for all new acquisitions in accordance with this [performance work statement].

. . . .

6.2.1.2 61st Day – Assignment of Unsold Inventory – On the sixty-first (61st) calendar day after the effective date of the contract, the Contractor shall be assigned, via P260 all unsold inventory in its awarded geographic area.

J.A. 733 (emphasis added).

According to Sage, the use of the word "all" in these provisions conferred exclusivity to Sage and created requirements contracts, notwithstanding the IDIQ labels the parties had given to the contracts. Sage further contends that any ambiguity with respect to exclusivity in Section 6.2 should be resolved in its favor, pointing out that the solicitation stated that "the government intends to award a single contract in each of the geographical areas rather than multiple awards in each area[,]" J.A. 180, and that, in its Q&A in the solicitation process, HUD described Section 6.2.1.2 as follows:

> [Q.] Section 6.2.1.2-61st day: Paragraph one says unsold inventory will be assigned in a random yet equal share in the awarded geographic area; however, Section 1.4 on page 14 says there is only one contractor per geographic area. Please clarify.
>
> A. If there is only one contractor per area, then the one contractor will receive all properties for the area provided. Section 6.2.1.2 has been revised accordingly.[2]

J.A. 607. Neither party disputes that Sage was the only awardee for the areas that were the subject of the REO Contracts. HUD nonetheless responds that neither Section 6.2.1.1 nor Section 6.2.1.2 required that Sage receive all new REO acquisitions.

---

[2]  Section 6.2.1.2 originally provided that each contractor would be assigned "a random yet equal share of unsold inventory in its awarded geographic area." J.A. 244. This section was amended to state that the contractor would be assigned "all unsold inventory in its awarded geographic area." J.A. 733.

Our predecessor court in *Mason v. United States*, 615 F.2d 1343 (Ct. Cl. 1980), confronted a similar argument from a governmental contractor and concluded that the contracts were IDIQ contracts. In *Mason*, the contracts at issue stated they were construction-type contracts for a one-year period in fixed geographical areas, with the "minimum quantity of work . . . required . . . [to] not total less than five thousand dollars." *Id.* at 1344–45. The contractor in *Mason* argued that its contracts were nonetheless requirements contracts because of a provision stating that labor and equipment "will be furnished and installed by a single contractor at the unit price established." *Id.* at 1345. The court explained that this provision merely described the nature of the planned work, laying out "what the contractor's capabilities shall be and where he may be required to perform his services[—]not what the Government is obligated to order." *Id.* at 1346. The court further noted that interpreting the contracts as requirements contracts on the basis of this language would render the guaranteed minimum provisions superfluous and would conflict with the provisions in the "Nashville Contracts" explicitly reserving the right to contract with other contractors. *Id.* at 1348, 1350; *see also Coyle's Pest Control*, 154 F.3d at 1306 (holding that a contract requiring the contractor "to furnish *all* labor, service, equipment, transportation, materials and supplies to provide . . . services on *assigned* properties" could not be a requirements contract because it did not require HUD to assign all such properties to the contractor).

Similarly, Sections 6.2.1.1 and 6.2.1.2 here simply described the government's plans for the manner in which the work would be performed. In *Mason* the two Nashville Contracts stated that any award under the contracts would "not prohibit or restrict the Government from having any work items performed by Government employees or by

others," indicating that the contracts were not requirements contracts.  615 F.2d at 1345.

Similarly, here, Sage's interpretation of Sections 6.2.1.1 and 6.2.1.2 would also render inoperable Section H.2's reservation of the right for the government to work with other contractors.  Section H.2 unequivocally entitled HUD to reduce Sage's work and award contracts to additional contractors for a particular area:

> After meeting the guaranteed contract minimum . . . the Government reserves the right to non-competitively increase or reduce the geographic service area of this contract . . . .  Under such circumstances, the Government could either invite one or more contractors to assume responsibility for the performance of increased geographic scope activities in accordance with the terms and conditions of a then existing contract for similar services in another area, or the Government could elect to allow two or more contractors for similar services to submit contract modification proposals . . . .

J.A. 747–48.

Section H.2, in permitting HUD to unilaterally reduce the scope of Sage's geographical region to zero and to utilize other contractors, was similar to the Nashville Contracts in *Mason*.  In fact, counsel for Sage at one point at oral argument conceded that the provision permitted HUD to award contracts to additional contractors.[3]  This ability to

---

[3]    "Q. If they exercised the option in H.2, they could have brought in another contractor to perform in the same geographic area?  A. Yes, sir."  Oral Arg. at 2:01–2:09.  While counsel attempted to retract this concession in rebuttal, *id.* at 25:24–40 ("I made a misstatement to you

engage other contractors is fatal to Sage's characterization of the REO Contracts as requirements contracts. As this court has explained, a requirements contract cannot be formed without a promise by the government to purchase all of its needs from the awardee. *See, e.g.*, *Coyle's Pest Control*, 154 F.3d at 1305 ("[A] requirements contract necessarily obligates the Government to purchase exclusively from a single source."); *Modern Sys. Tech. Corp.*, 979 F.2d at 205 ("A requirements contract is formed when the seller has the exclusive right and legal obligation to fill all of the buyer's needs for the goods or services described in the contract."). HUD could not bind itself to purchase all services from Sage while simultaneously reserving the right to employ other contractors. *See, e.g.*, *Franklin Co. v. United States*, 381 F.2d 416, 419 (Ct. Cl. 1967) (explaining that a contract that permitted the government to order the same services from multiple contractors could not be a requirements contract as the government cannot "bind itself twice for the same work").

Sage nevertheless urges that even if Section H.2 permitted HUD to contract with other contractors, HUD did not exercise this option and thus the REO Contracts—as they existed at the time of termination—were requirements contracts. This argument again misses the mark. The problem for Sage is that, by retaining the government's right to work with other contractors, the REO Contracts on their face are incompatible with exclusivity.

---

earlier, so however you want to characterize it, H.2 does not add a second contractor to an area."), we are persuaded that the initial admission was correct under the REO Contracts.

## II

Sage next contends that the Board erred in holding that HUD's issuance of a six-month task order for Option Period 2 was proper. Section F.2 of the REO Contracts, entitled "PERIOD OF PERFORMANCE," provided that the government could exercise its option to extend the terms of the contracts for four consecutive twelve-month option periods. J.A. 738–39. Section B.6 of the REO Contracts, entitled "ORDERING," stated that "Written Task Orders for [the contracts] will be issued on a yearly basis." J.A. 663. According to Sage, Section B.6 of the REO Contracts required HUD to issue 12-month task orders, rather than merely issuing task orders once per yearly option period. In support of this argument, Sage notes that in government contracts, the term "will" is used to indicate an obligation. *See* 85 Fed. Reg. 53,755, 53,756 (Aug. 31, 2020) ("To indicate an obligation for the Government to act, the term 'will' is used.").

We cannot agree that the government was obligated to issue task orders of one year. Nothing in Section B.6 nor any other provision of the REO Contracts imposed an affirmative obligation on HUD to issue work orders of a 12-month duration. Rather, the most natural reading of the language in the provision is simply that task orders were to be issued once per year. *See Yearly*, WEBSTER'S THIRD INTERNATIONAL DICTIONARY (2002) ("reckoned by the year; occurring, appearing, or being made, done, or acted upon every year or once a year; annual"). Thus, to the extent that the government was obligated to issue task orders, its obligation was discharged by issuing a task order once per year. We decline Sage's invitation to overlook the plain and ordinary meaning of contract terms to impose an affirmative obligation on one of the parties when such an obligation is not readily apparent from the face of the contract.

In any case, even if Sage were correct in its contention that Section B.6 obligated HUD to issue 12-month orders in connection with each option period, it cannot recover under the REO Contracts because HUD ordered the guaranteed minimum associated with each contract. Because the REO Contracts were IDIQ contracts, HUD fully discharged its contractual obligations when it ordered the guaranteed minimums, and Sage is thus not entitled to any damages. *See Varilease Tech. Grp.*, 289 F.3d at 799–801 (explaining that the government's only obligation under an IDIQ contract is to satisfy the guaranteed minimum).

## III

Finally, Sage argues that the Board erred in holding that HUD's diversion of inventory through its REO alternatives did not breach the Bridge Contract Sage's only support for this contention is that "[t]he Bridge Contract does not address any exclusions for types or classes of inventory or types of transactions . . . from the requirements that Sage would fill." Appellant's Br. 60. While Sage concedes that HUD assigned all properties that were part of the REO disposition program during the Bridge Contract's period of performance to Sage, it contends that HUD's use of alternatives to the REO disposition of properties decreased the total number of properties covered by the contract.

Unlike an IDIQ contract, as noted earlier, a requirements contract requires the government to "fill all its actual requirements for specified supplies or services during the contract period by purchasing from the awardee." *Medart, Inc. v. Austin*, 967 F.2d 579, 581 (Fed. Cir. 1992). As we have explained, "where the government enters into a requirements contract . . . but does not use the contractor to satisfy those requirements and instead diverts business away from the contractor, the contractor

is entitled to recover lost profits on the diverted business[.]" *Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1379 (Fed. Cir. 2004).  Under the superior knowledge doctrine, there is an implied duty for the government "to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance."  *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000).

Section B.2 of the Bridge Contract, entitled "SERVICES," plainly stated that the awardee would serve as the asset manager contractor in accordance with the Performance Work Statement.  And Section 1.1 of the Performance Work Statement, entitled "INTRODUCTION," disclosed that HUD was "seeking contractor support to provide asset management services for HUD's [REO] properties."  J.A. 73.  There was no indication in either the Bridge Contract or the Performance Work Statement that Sage would be entitled to services associated with the disposition of properties other than those that formed part of the REO portfolio in the relevant geographical regions.  And the parties do not dispute that HUD assigned all properties covered by the REO program to Sage during the Bridge Contract's period of performance.  Thus, HUD plainly discharged its obligation under the terms of the contract.

However, Sage argues that HUD was not permitted to divert properties to REO alternatives.  This court has previously explained that in the requirements context, a contractor that alleges that the buyer breached the contract by reducing its requirements has the burden of proving that the buyer acted in bad faith, holding that "[i]n the absence of such a showing, the buyer will be presumed to have varied its requirements for valid business reasons, i.e., to have acted in good faith, and will not be liable for the change in requirements."  *Tech. Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1373 (Fed. Cir. 1998); *see also*

*Medart*, 967 F.2d at 581 (explaining that although "actual purchases vary[ing] significantly from government estimates does not ordinarily give rise to liability on the part of the government . . . the government must act in good faith and use reasonable care in computing its estimated needs"). Here, there is no indication that HUD diverted inventory from its REO disposition program in order to avoid its obligations under the Bridge Contract, nor has Sage alleged as much. On the contrary, the government has explained that its use of REO alternatives was grounded in the legitimate business purpose of cutting costs associated with foreclosures.

Sage fares no better to the extent that it seeks to invoke the superior knowledge doctrine as an equitable basis for recovery on the Bridge Contract. As we have explained, this doctrine applies if "'the government was aware the contractor had no knowledge of and had no reason to obtain such information [and] any contract specification supplied misled the contractor or did not put it on notice to inquire.'" *Scott Timber Co. v. United States*, 692 F.3d 1365, 1373 (Fed. Cir. 2012) (quoting *Hercules Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994)). Here, the Board considered the record before it and concluded that "Sage was well aware of these [alternative] programs and HUD's use of them before it entered the bridge contract on November 30, 2017." *Sage*, CBCA 7319, 23-1 BCA ¶ 38,315 at 186,059. Since HUD's strategy to increase its use of REO alternatives was knowledge readily obtainable by Sage, HUD was under no obligation to volunteer further information. *Giesler*, 232 F.3d at 877; *H.N. Bailey & Assocs. v. United States*, 449 F.2d 376, 383 (Ct. Cl. 1971) ("[T]he Government is under no duty to volunteer information in its files if the contractor can reasonably be expected to seek and obtain the facts elsewhere . . . .").

CONCLUSION

For the foregoing reasons, the judgment of the Board is affirmed.

**AFFIRMED**