ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| D-STAR Engineering Corp. | ) | ASBCA Nos. 62075, 62780 |
| | ) | |
| Under Contract No. FA8650-12-C-7243 | ) | |

APPEARANCE FOR THE APPELLANT:     Mr. S. Paul Dev
   President

APPEARANCES FOR THE GOVERNMENT:    Samuel W. Morris, Esq.
   DCMA Chief Trial Attorney
  Adrianne L. Goins, Esq.
   Trial Attorney
   Defense Contract Management Agency

OPINION BY ADMINISTRATIVE JUDGE HERZFELD

     The Defense Contract Management Agency (DCMA) terminated a contract with D-STAR Engineering, Inc. (D-STAR), for convenience.  In auditing D-STAR's termination settlement proposal, the government determined that it had overpaid D-STAR and issued a contracting officer's final decision with a debt demand to D-STAR.  D-STAR appeals the government's debt demand claim.  Also, D-STAR appeals a subsequent contracting officer's final decision that denied recovery of additional costs D-STAR incurred separate from the termination settlement proposal. The parties submitted these appeals for decision without a hearing under Rule 11 – a trial on the record.  For the reasons discussed below, we sustain DCMA's debt demand claim, award the government $282,926 (plus any interest due), and deny D-STAR's appeal of this government claim.  We sustain D-STAR's claim in ASBCA No. 62780 in the amount of $16,272.16, plus Contract Disputes Act (CDA) interest.  Otherwise, D-STAR's claims are denied in these appeals.

I.     *The Partial Stop-Work Order, the Termination for Convenience, and Termination Settlement Proposal*

On July 16, 2012, the United States Air Force awarded D-STAR a cost-plus-fixed-fee research and development contract for $4,806,502 to build a fuel-to-power generation system for an unmanned vehicle (R4, tab 1 at 1-2, 42; *see id*. at 6, 13 (incorporating by reference Federal Acquisition Regulation (FAR) 52.216-7, ALLOWABLE COST & PAYMENT (JUN 2011), and FAR 52.246-8, INSPECTION OF RESEARCH AND DEVELOPMENT – COST-REIMBURSEMENT (MAY 2001)).[1]  DCMA administered the contract (R4, tab 1 at 1).

On July 1, 2013, DCMA's contracting officer issued a partial stop-work order, instructing D-STAR to stop all work except (1) "progress reports and an integrated final report for phase 1 effort" and (2) the "deliverables, schedules[,] and requirements of financial and technical data, plans[,] and reports required for this effort from the contractor . . . identified in the Contract Data Requirements List" (R4, tab 1 at 7 (contract incorporating by reference Stop-Work Order clause, FAR 52.242-15 (AUG 1989) – Alt. I (APR 1984)), tab 3).  The partial stop-work order reminded D-STAR that it needed to "take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage" (R4, tab 3).

On September 26, 2013, D-STAR submitted its "Draft Final Report" to DCMA consistent with the contract (R4, tab 1 at 7 (stating that the "draft final report" was due on September 26, 2013), tab 46; app. supp. R4, tab 22).  On September 30, 2013, D-STAR reminded DCMA that the 90-day stop-work order had expired, requested an equitable adjustment, and planned to resume work (app. supp. R4, tab 23 at 1-2).  For the next four weeks, DCMA attempted to convince D-STAR to execute a modification extending the stop-work order, but D-STAR attempted to negotiate continuing work to finalize the report (*id.* at 3-13).  On October 29, 2013, DCMA's contracting officer informed D-STAR that the agency decided not to extend the stop-work order but instead intended to terminate the contract for convenience (*id.* at 14).  In response, D-STAR asserted that DCMA could not terminate the contract but had to continue to negotiate under the Stop-Work Order clause (*id.* at 15).

On November 1, 2013, DCMA's contracting officer issued a contract modification terminating the contract for convenience (R4, tabs 4-5; *see also* R4, tab 1

---

[1] DCMA numbered the Rule 4 file as "G-00000[page number]," but in our citations we have eliminated the pre-fix and zeroes and use only the page number for brevity.

at 14 (contract incorporating by reference the Termination (Cost-Reimbursement) clause, FAR 52.249-6 (MAY 2004))). D-STAR acknowledged receipt of the termination notice but rejected the "legality" of the agency's termination, again asserting that the agency had to continue negotiating an extension to the stop-work order (app. supp. R4, tab 23 at 17). DCMA responded that the Termination (Cost-Reimbursement) clause allowed the agency to unilaterally terminate the contract for convenience (R4, tab 47 at 2339). Regardless, on November 5, 2013, DCMA's contracting officer provided D-STAR with documents, including forms, instructions, and relevant Federal Acquisition Regulation (FAR) provisions, to assist D-STAR in preparing its termination settlement proposal (app. supp. R4, tab 24 at 1-3). DCMA also requested an estimate of "the total dollar amount of [D-STAR's] proposal at your earliest opportunity" (*id.* at 3). On December 2, 2013, D-STAR estimated its termination costs as $912,858 (app. supp. R4, tab 3 at 2). In response, DCMA's contracting officer encouraged D-STAR's representative to "take a moment to read FAR Part 49 and Part 31.205-42 Termination costs" in preparing the termination settlement proposal (app. supp. R4, tab 24 at 15).

For the next several months, D-STAR queried DCMA regarding how to prepare its termination settlement proposal and DCMA's termination contracting officer responded with some guidance (app. supp. R4, tabs 24, 26). On June 2, 2014, D-STAR submitted a "Draft" termination settlement proposal for $601,336 but noted it had "zero prior experience related to Termination of Contracts" and wanted to discuss the proposal with DCMA (R4, tab 6 at 56-57, 63). By the end of June, D-STAR representatives spoke with the DCMA's contracting officer by teleconference to discuss the termination settlement proposal, resulting in the contracting officer again forwarding the FAR provision regarding termination costs (FAR 31.205-42) to D-STAR (app. supp. R4, tab 24 at 26-28).[2]

On October 30, 2014, D-STAR submitted a signed termination settlement proposal (on Standard Form 1437), which requested a net payment of $674,819.64 (which derived from subtracting DCMA's net payments on the contract, $3,552,726.51, from the net costs incurred by D-STAR, $4,227,546.15).

---

[2] In August 2014, the Air Force Office of Special Investigations and Defense Criminal Investigative Service began a criminal investigation of D-STAR (R4, tabs 47-51, 55). In March 2015, the investigators subpoenaed D-STAR's records from the terminated contract (app. supp. R4, tab 8). In September 2017, the U.S. Attorney's office declined to prosecute and, in October 2017, the investigators informed D-STAR and DCMA that the Air Force had closed the criminal investigation, allowing negotiation of the termination settlement proposal (R4, tabs 74-75).

3

On July 30, 2015, D-STAR submitted a revised termination settlement proposal (again on Standard Form 1437), which decreased its net payment request from $674,819.64, to $437,057.40 (R4, tab 8 at 75). In revising and re-calculating the termination settlement proposal, D-STAR reduced its net costs from $4.2 million to $4,033,783.92, and credited additional payments from DCMA by $44,000.01 (recognizing that DCMA had paid D-STAR $3.596 million rather than $3.552 million) (R4, tab 8 at 75).

II. *DCAA's Audit*

On August 21, 2015, the Defense Contract Audit Agency (DCAA) began auditing D-STAR's July 2015 termination settlement proposal (R4, tabs 57-58).[3] On November 13, 2015, DCAA informed DCMA's contracting officer that D-STAR's July 2015 termination settlement proposal was "inadequate and noncompliant" with the FAR and "should be returned for corrective action prior to our proceeding with the requested audit" (R4, tab 9 at 78).

In response, D-STAR retabulated its costs "to meet DCAA needs" for an audit and submitted a revised termination settlement proposal on November 21, 2015 (R4, tab 10, tab 59 at 2418). The November 2015 proposal now sought a net payment of $442,783.01 (subtracting its net payments of $3.596 million from net costs of $4.039 million) (R4, tab 10 at 80). DCAA now concurred that D-STAR had provided sufficient information to conduct the audit (R4, tab 62 at 2422). In May 2016, DCAA began communicating with D-STAR regarding its audit of the November 2015 proposal (app. supp. R4, tab 37 at 4-6).

On September 23, 2016, DCAA provided D-STAR with draft audit findings, which questioned $928,133 of D-STAR's costs and tentatively concluded that D-STAR owed the government $485,351 (app. supp. R4, tab 41 at 8-9). On September 30, 2016, D-STAR responded, questioned DCAA's preliminary findings, and attempted to explain why D-STAR had acted appropriately in calculating its costs (app. supp. R4, tab 13).

DCAA provided its final audit report to D-STAR on January 5, 2017 (app. supp. R4, tab 43 at 1; R4, tab 11). The final audit report questioned $925,624 of D-STAR's net proposed settlement costs of $4.039 million, resulting in DCAA only crediting $3,113,886 in net settlement costs (R4, tab 11 at 90). After subtracting the prior payments of $3.596 million from DCAA's assessment of net settlement costs (again, $3,113,886), DCAA concluded that D-STAR owed the government $482,841

---

[3] DCMA's contracting officer had previously requested DCAA to audit D-STAR's October 2014 termination settlement proposal (R4, tab 52 at 2361-62).

(*id.* at 86-87, 90).  DCAA questioned five types of costs on the contract:  (1) direct labor costs; (2) indirect factory expenses; (3) general and administrative (G&A) expenses; (4) fee; and (5) settlement expenses (*id.* at 86-87).

First, DCAA questioned $86,922 of D-STAR's proposed direct labor costs of $504,793 associated with its termination based on allowability under FAR 31.201-2(a), and under the Stop-Work Order clause (R4, tab 11 at 86, 93).  DCAA evaluated D-STAR's accounting records and found that D-STAR's proposal allocated $71,942 in labor costs as incurred prior to the stop work order, but these costs were actually incurred after the stop-work order (*id.* at 93).  Also, DCAA asked DCMA to evaluate the reasonableness of D-STAR's proposed $21,444 in direct labor costs from the stop-work order to the termination for convenience and DCMA concluded that "$6,464.17 and 117.2 hours is fair an[d] allocable" for these costs (*id.* at 93, 105).  DCMA reviewed each time entry for each employee between the partial stop-work order through termination, denying hours as (1) excessive, (2) unauthorized design work after the partial stop-work order, (3) failing to include work descriptions, (4) work on unchanged monthly reports, and (5) allegedly preparing an incomplete draft report (R4, tab 26 at 1453-57, tab 45).

Second, DCAA questioned $131,383 of D-STAR's proposed $623,183 in indirect factory expenses from the termination settlement proposal (R4, tab 11 at 94).  D-STAR based its termination costs on its indirect cost proposal for calendar year 2013, which claimed an engineering overhead rate of 124.18% (from a pool of $691,817 and base of $557,095) (R4, tab 23 at 1404).  DCAA disallowed $38,366 in D-STAR's engineering overhead pool per FAR 31.205-26(d), Material Costs, and FAR 45.402 (Title of Contractor-Acquired Property) (R4, tab 11 at 86).  DCAA reviewed invoices from D-STAR to the government for these materials, D-STAR's accounting records that showed the government had paid for these materials, and concluded that the government had already paid D-STAR "in full for this inventory, therefore it is Government property and the contractor had no right to transfer this cost from the Inventory (asset) account to the Supply (Overhead Pool) account" (R4, tab 11 at 86, tab 18 at 1064 (D-STAR accounting records regarding materials), tab 29 at 1525, 1530 (D-STAR vouchers/invoices)).  DCAA also asserted travel costs should have been removed from this same overhead pool (R4, tab 11 at 86, 96-97).  Based on the adjustments to the overhead pool (and using D-STAR's proposed base), DCAA concluded that the engineering overhead rate should have been lowered by 9.2% from 124.18% to 114.98% and, when applied to the direct labor costs, resulted in DCMA questioning $131,383 (*id.* at 97).

Third, DCAA questioned $133,485 of D-STAR's proposed $795,538 in G&A expenses in its termination settlement proposal (*id.* at 90).  D-STAR again based its termination costs on its indirect cost proposal for calendar year 2013, which claimed a

5

G&A rate of 36.94% (R4, tab 23 at 1404). DCAA questioned $36,237 in D-STAR's amortized long-range planning costs for attending exhibitions and trade shows in 2011 regarding two projects because (1) the contractor's journalized costs, timesheets, and travel reports did not support $4,944 of the costs, and (2) D-STAR improperly added $31,293 burden costs (overhead and G&A) "on top of [long-range planning] G&A expenses" (R4, tab 11 at 94-97, tabs 15-17, tab 22 at 1401-03). DCAA also questioned $9,600 in independent research and development (IR&D) and bid and proposal (B&P) costs because D-STAR applied the incorrect engineering overhead rate (as discussed above) to these costs (R4, tab 11 at 95-97, tab 23 at 1406, 1412). DCAA again questioned travel costs as applied in the G&A context (R4, tab 11 at 86, 96). DCAA questioned 3.72% of the proposed expense rate, lowered the rate to 33.21%, and applied it to the direct material, direct labor, indirect factory expense, and other costs to arrive at the questioned costs of $133,485 (R4, tab 11 at 86, 97; gov't br. at 47).

Fourth, DCAA questioned $65,985 of D-STAR's proposed $319,392 in fee (R4, tab 11 at 86, 98-99). D-STAR's termination settlement proposal based its fee calculation on an accelerated double-declining balance method,[4] justifying it by asserting that "work done early during the R&D contract is technically more challenging than work later during the contract, and is hence deserving of a greater rate of fee" (R4, tab 10 at 81, tab 11 at 98, tab 25 at 1426, 1450-51). D-STAR's proposed fee equated the amount it would normally have received after a 78.5% completion of the contract (although D-STAR also noted that the straight-line method would result in 70.3% based on its proposed costs as a percentage of the estimated cost of the contract) (*see* R4, tab 12 at 150). DCMA provided DCAA with its technical assessment that D-STAR had only completed 59% of the contract based on reviewing D-STAR's "documents, files, time sheets and vouchers" to assess the amount of incurred costs (R4, tab 11 at 104). DCMA calculated its percentage of completion based on the ratio of incurred costs to the total estimated cost in the contract (*id.*). DCAA asserted that it could not use the double-declining balance method because "the contract stipulates a flat 9.25 percent fee rate based on the costs incurred" (R4, tab 1 at 3 ("As determined by the contracting officer, [the fee] shall be paid as it accrues, in regular installments based upon the percentage of completion of work"), tab 10 at 81, tab 11 at 98-99). Using the straight-line method, DCAA concluded that the allowable fee should only be $253,407 (9.25% x $2,739,536 in unquestioned total costs)

---

[4] "Under this method, the cost or other basis of the property is deducted at a higher depreciation amount in the earlier periods and a lower amount in the later periods." DCAA, SELECTED AREA OF COST GUIDEBOOK: FAR 31.205 COST PRINCIPLES ¶ 19-2.2 at 19-4. The Generally Accepted Accounting Principles permit the use of the declining balance method (including a double-declining balance method). *See* FEDERAL ACCOUNTING STANDARDS BOARD, Standard 360-10-35-7.

resulting in receiving 62.3% of the original fee (R4, tab 11 at 99). By keeping the straight-line method, DCAA's calculation of a 62.3% completion rate effectively relied only on the ratio of costs incurred to the total estimated cost to determine the percentage of completion for the fee ($2,739,536/4,399,544 = 62.3%).

Fifth, DCAA questioned $507,849 of D-STAR's proposed settlement costs of $627,654 (R4, tab 11 at 86, 99). DCAA requested that DCMA assess the reasonableness of D-STAR's proposed 2,810.7 direct labor hours amounting to $182,408.85[5] in settlement costs (R4, tab 11 at 100, 105-06, tab 25 at 1444, tab 35 at 1642). DCMA reviewed D-STAR's timesheets and vouchers and recommended (1) finding only 317.95 hours reasonable, of D-STAR's proposed 1,187.7 hours for entering 129 inventory items into DCMA's Plant Clearance Automated Reutilization Screening System, (2) disallowing other time entries without descriptions, and (3) disallowing repetitive costs as excessive and unreasonable (R4, tab 11 at 105-06, tab 35 at 1643-50). DCMA concluded that only "$44,276.31 [representing] 681.35 labor hours is fair and allocable . . . for settlement expenses" (R4, tab 11 at 106). DCAA accepted DCMA's analysis of the direct labor (id. at 99-100). DCAA accepted D-STAR's proposal of $28,830 in other direct costs (id. at 100). Then, DCAA assessed and lowered D-STAR's proposed burden (both engineering overhead and G&A) to be added to the direct costs, limiting the rates to payroll taxes, fringe benefits, occupancy costs, and immediate supervision costs per Termination cost principle – FAR 31.205-42(g)(1)(iii) (R4, tab 11 at 100, tab 23 at 1410, tab 33 at 1621-23, 1633-35). DCAA recommended allowing only $119,805 in settlement expenses (R4, tab 11 at 100).

III.    *D-STAR's Response to the Audit*

On February 13, 2017, D-STAR responded to the DCAA audit report (R4, tab 12).

First, as to the direct labor costs that DCAA questioned as unallowable, D-STAR requested that DCAA identify "which hours of which person during which week are being 'questioned'" and give D-STAR the opportunity to provide additional information to justify the hours as allowable (id. at 119, 156). Generally, D-STAR asserted its costs were justified during this period to (1) research the FAR regarding the partial stop-work order, (2) support a visit from the government technical team regarding scheduling issues, (3) discuss and email with government officials regarding the project and potential new scope, (4) support discussions to move the project to the Defense Advanced Research Projects Agency, (5) support a technical interchange meeting by teleconference, (6) consolidate and collate all technical data, (7) respond to a request for proposal to revise the scope of work of the project, (8) provide interim

_____

[5] D-STAR calculated these costs to be $181,524.72, but DCMA's calculation found $182,408.85 in proposed labor costs (R4, tab 11 at 105).

monthly reports to the government, and (9) prepare the report required by the scope of work not halted by the stop-work order (*id.* at 157).

Second, as to the questioned costs regarding indirect factory expenses, D-STAR disagreed (*id.* at 118, 134-35). As to the disallowance of $38,366 in material included in the engineering overhead account, D-STAR stated it appropriately included the materials in the company's inventory as overhead because D-STAR had given the government a credit for these materials to offset a cost overrun on another contract that D-STAR "waived" (*id.* at 134-37). D-STAR acknowledged that it "did not 'dot all the i's" by obtaining approval from the government's contracting officer on that other contract but asserted that a "check was not needed . . . because the government owed a net amount to" D-STAR (*id.* at 134-35). As to the travel expenses, D-STAR stated these were proper because they related to the company's president travelling between his home office in Virginia and the company's office in Connecticut (*id.* at 138). D-STAR also noted that the government had approved and paid similar travel expenses in prior years (*id.* at 138-48).

Third, as to the questioned G&A costs, D-STAR reiterated that its travel costs were valid (*id.* at 138-48). As to the long-range planning costs regarding two projects that were amortized over three years, D-STAR acknowledged that they could have been "fully expensed in the year they were incurred" but D-STAR determined that these long-range planning costs should be treated as "long term" costs amortized over three years (*id.* at 149). "Accordingly, rather than being expensed immediately, these costs were treated as prepaid expenses with benefits expected to accrue over a three-year period" and "expensed over a three-year period" (*id.*). D-STAR pointed to "standard accounting practices" (without citation) that allegedly justified adding overhead and G&A burden to costs that were already burdened with G&A expenses (*id.*). Additionally, D-STAR requested additional details so it could "find supporting documentation" for its costs (*id.*).

Fourth, as to the questioned use of its fee, D-STAR asserted that its double-declining balance method of computing the fee was fair and reasonable (*id.* at 150-51). D-STAR justified the use of the accelerated fee recovery because (1) D-STAR incurred costs by making "significant financial investments for the project, such as hiring personnel, upgrading facilities" that it never fully realized because of an inadequate "period of amortization and recovery of costs and fees," (2) the termination reduced direct costs to the company, thereby increasing overhead and G&A rates across other contracts, (3) the termination resulted in the company laying off employees and effectively shutting down, (4) D-STAR had to incur wind down expenses, and (5) the accelerated fee would cost less than D-STAR's time value of money, which it believed it should recover based on the government's delay in resolving the termination settlement proposal (*id.* at 151).

Fifth, as to the questioned settlement costs, D-STAR requested that DCMA "provide more details" regarding the basis for disallowing the settlement costs (*id.* at 120, 169). D-STAR asserted that its direct labor settlement costs were justified because this time was used to (1) understand the FAR's termination procedures, (2) communicate with the termination contracting officer seeking guidance, (3) unsuccessfully search for suitable attorneys and consultants, (4) prepare and revise D-STAR's settlement estimate and four iterations of D-STAR's termination settlement proposal, (5) work with the government to secure International Traffic in Arms regulated data and project-related hardware, (6) dispose of government hardware, and (7) respond to the government's audit of the proposal (*id.* at 170-73).

IV.    *The Parties' Claims and DCMA's Contracting Officer Decisions*

On February 12, 2018, DCMA issued a debt determination and demand letter to D-STAR, reiterating the conclusion of DCAA's audit report that D-STAR owed the government a debt of $482,481 (R4, tab 13 at 175 (citing the provisions of FAR Part 32.6 regarding debt collection)).

On February 27, 2018, D-STAR sent DCMA's contracting officer three communications: (1) a letter disputing the debt determination (app. supp. R4, tab 20); (2) a request to defer collection of the debt (app. supp. R4, tab 19); and (3) a certified claim requesting a final decision from the contracting officer (R4, tab 14).

D-STAR's certified claim sought (1) $442,783 from the November 2015 termination settlement proposal, (2) $70,367 for D-STAR's costs incurred responding to government audits and providing information supporting its termination settlement proposal, which it supported with time records that included the time worked, hourly rate, and descriptions of the work performed, (3) interest running from December 2015, and (4) $175,000 "in recognition of the harm done" to D-STAR by "inappropriate actions and inaction by the government" (*id.* at 177-82).

After receiving no final decision, D-STAR filed a notice of appeal with this Board on January 21, 2019 (ASBCA No. 61947).

On March 18, 2019, DCMA's termination contracting officer issued a final decision, denying D-STAR's claim for $442,783 in termination settlement proposal costs and concluding that D-STAR was "indebted to the Government in the amount of $326,583" – reducing the amount of the government's original debt demand of $482,841 (R4, tab 37 at 1667, 1669). DCMA stated that the "notification rescinds and replaces the previous demand for payment" (R4, tab 37 at 1669). Like the DCAA audit report, DCMA's contracting officer catalogued the difference between the costs detailed in D-STAR's termination settlement proposal and the government's position on those costs:

9

| Cost Element | D-STAR Proposal | Difference | Government Position |
|---|---|---|---|
| Direct Material | $193,135 | $0 | $193,135 |
| Direct Labor | 504,793 | 62,437 | 442,356 |
| Indirect Factor Expense | 623,183 | 104,344 | 518,839 |
| Other Costs | 974,677 | 0 | 974,677 |
| Subtotal | $2,295,788 | $166,781 | $2,129,007 |
| G&A Expense | 795,538 | 64,863 | 730,675 |
| Total Costs | $3,091,326 | $231,644 | $2,859,682 |
| Fee | 319,392 | 54,779 | 264,520 |
| Settlement Expenses | 627,654 | 482,849 | 144,805 |
| Settlement with Subcontractors | 1,350 | 0 | 1,350 |
| Gross Proposed Settlement | $4,029,722 | $769,272 | $3,270,144 |
| Disposal & Other Credits | (213) | 0 | (213) |
| Net Proposed Settlement | $4,039,510 | $769,272 | $3,270,144 |
| Prior Payments to Contractor | 3,596,727 | 0 | 3,596,727 |
| Net Payment Requested | $442,783 | $769,272 | ($326,583) |

(R4, tab 37 at 1667)  Notably, the contracting officer had reduced the questioned costs from $925,624 in the DCAA report to $769,272 in the final decision, reducing the amount of questioned costs in each of the categories (*compare* R4, tab 11 at 90, *with* tab 37 at 1667).

As to direct labor costs, the contracting officer allowed $30,949.17 for labor after the stop-work order (increased from the $6,464.17 in the DCAA report and original debt demand), adding "$24,485, half of the proposed labor associated with the report to reimburse the contractor for efforts performed to compile the data for the incomplete report" (R4, tab 37 at 1668).  However, as noted in the chart above, DCMA still only allowed $442,356 in direct labor costs, which was still $62,437 lower than what D-STAR had proposed (*id.*).

As to indirect factory expenses, the contracting officer decreased the indirect rate for the engineering overhead pool from 124.18% in D-STAR's indirect cost proposal to 117.29%, but not as low as the 114.98% suggested by DCAA's audit (*compare* R4, tab 11 at 95 (DCAA report including 114.98%), *with* tab 23 at 1404 (124.18% in indirect cost proposal), *and*  tab 37 at 1668 (final decision including 117.29% rate)).  Based on the allowed overhead rate, the contracting officer appears to have agreed with D-STAR's position that its travel expenses were properly part of the indirect cost pool (and those costs are no longer at issue on appeal).  However, the

contracting officer agreed with DCAA that D-STAR had improperly included $38,366 in materials the government had already paid for as part of the engineering overhead pool (and that cost is still at issue on appeal), resulting in disallowing $104,344 of indirect factory expenses (R4, tab 37 at 1667).[6] The voucher from another contract that allegedly credited $38,366 back to the government did not have any amounts owed by the government to D-STAR and, thus, nothing to permit D-STAR's alleged credit (R4, tab 77 at 2910-13). Notably, D-STAR attempted to offset the $38,366 in materials against D-STAR's allegedly incurred costs "in Excess of Ceiling" for that other contract (*id.* at 2910). Yet, that contract included a Limitation of Cost provision that did not obligate the government "to reimburse the Contractor for costs incurred in excess of . . . the estimated cost specified in the schedule" (FAR 52.232-20(d)(1) (incorporated by reference in referenced contract at R4, tab 40 at 1833).

As to G&A expenses, the contracting officer decreased D-STAR's proposed rate of 36.94% in its indirect cost proposal to 34.32% (which is higher than DCAA's proposed rate of 33.21%) (*compare* R4, tab 11 at 97 (DCAA report), *with* tab 23 at 1404 (D-STAR indirect cost proposal), and with tab 37 at 1668 (final decision)). The contracting officer only cited the long-range planning costs and IR&D and B&P costs as the basis for reducing the base but, again, included the travel costs in the cost base (R4, tab 37 at 1688, tab 39 at 1814). Removing these costs from the G&A pool, resulted in a 34.32% G&A rate (R4, tab 37 at 1688, tab 39 at 1814). The contracting officer applied the 34.32% G&A rate to the allowable contract costs from the termination settlement proposal (direct costs, direct labor, indirect factory expense, and other costs of $2,129,007) and resulted in allowing $730,675 and questioning $64,863 in G&A costs (R4, tab 37 at 1667-68, tab 39 at 1814).

As to the fee, the contracting officer agreed with DCAA that D-STAR could not use the double-declining balance method of computing the fee (R4, tab 37 at 1668; tab 39 at 1814). Instead, the contracting officer applied the straight-line method of computing the 9.5% fee, resulting in allowing $264,520 of the $319,392 D-STAR sought for the fee (which allowance was higher than what DCAA had calculated, because the contracting officer had allowed other costs, as noted above) (R4, tab 37 at 1668, tab 39 at 1814). Using the straight-line method again resulted in determining

---

[6] By subtracting the $38,366 from the engineering overhead pool, the new engineering overhead pool was $653,451, which the contracting officer divided by the engineering base ($557,095) to arrive at the new indirect rate of 117.29% (R4, tab 11 at 95 (discussing the calculation method and the $557,095 engineering base), tab 37 at 1668). The contracting officer then multiplied the 117.29% indirect rate with the direct labor costs it found allowable ($442,356) to arrive at allowable indirect factory expenses of $518,839 (R4, tab 37 at 1668). The contracting officer subtracted the amount D-STAR proposed ($623,183) from what she found allowable ($518,839) to arrive at the disallowance of $104,344.

11

the percentage of completion for fee purposes by solely looking at the ratio of incurred costs to total estimated costs ($264,520/406,958 = 65% = $2,859,682/4,399,544) (R4, tab 1 at 3 (figures for fixed fee and total estimated cost in contract), tab 37 at 1667-68 (figures for incurred costs and resulting fee allowed).

As to the settlement expenses, the contracting officer disallowed $482,849 of the proposed settlement expenses and allowed $144,805 (R4, tab 37 at 1669, tab 39 at 1814). In particular, DCMA agreed with DCAA, concluding that (1) "$44,276.31 representing 681.35 labor hours is fair and allocable for settlement labor," (2) DCAA's calculations regarding G&A and engineering overhead were proper, and (3) D-STAR should be allowed its other direct costs as proposed (R4, tab 37 at 1669, tab 39 at 1814). Departing from DCAA, the contracting officer "allowed $25,000 to capture any additional costs incurred from audit issuance date to present," which accounted for the increased allowance of $144,805 in her decision (from the $119,805 recommended by DCAA) (R4, tab 11 at 100, tab 37 at 1669, tab 39 at 1814).

On May 16, 2019, D-STAR timely appealed the contracting officer's March 2019 final decision to this Board (ASBCA No. 62075). In addition to the four costs D-STAR sought in its February 2018 claim that the contracting officer denied, D-STAR's complaint also sought $10,000 in clean-up costs, gave a credit for $4,800 in B&P costs, and sought an additional "penalty" of $94,645 related to government's February 2018 debt demand (June 2019 compl. at 49-51). The Board consolidated the new appeal with ASBCA No. 61947. DCMA moved to dismiss ASBCA No. 61947 and, during a status conference, highlighted the claimed costs in ASBCA No. 62075 that were not previously submitted to the contracting officer. After the Board conferred with the parties, the Board permitted D-STAR to submit a new claim to the contracting officer seeking the costs raised for the first time on appeal.

On August 17, 2020, D-STAR submitted its new certified claim for $917,360, incorporating its prior claimed costs with the new ones it had not previously submitted to the contracting officer for decision (R4, tab 38). In particular, D-STAR sought (1) $437,057 for costs and fee accrued till the July 2015 termination settlement proposal, (2) $5,726 for costs incurred to support the first audit that was included in the termination settlement proposal, (3) $70,567 for D-STAR's costs incurred responding to government audits and providing information supporting its termination settlement proposal from submission of the proposal through its February 2018 certified claim, (4) $13,090 in clean-up costs, including $10,000 promised by "verbal contract" after a former employee had cleaned up "the mess created by the disposition of inventory of the terminated contract, such as by disassembly, shipping, etc.," and G&A for these costs, (5) a $6,283 credit to the government for B&P costs, (6) $119,828 in "Estimated costs incurred" by D-STAR after it filed its February 2018 certified claim, (7) $83,342 in interest for the above claims from the time it submitted its July 2015 draft termination settlement proposal through August 2020, and (8) a

$194,033 "[p]enalty at the standard of 6% per annum, for the Government's unreasonable delays and inappropriate actions that have caused considerable harm" (*id.* at 1672, 1685). As to the clean-up costs, D-STAR presented no supporting proof of its incurred costs but stated that its president estimated that these services were worth $10,000 (*id.* at 1685). The former employee neither recorded the time it took to complete the clean-up services nor submitted a bill for these services after completing them (*id.*).

On November 16, 2020, DCMA denied D-STAR's August 2020 certified claim and again concluded that D-STAR "is indebted to the government in the amount of $326,583" (R4, tab 39 at 1812). DCMA's contracting officer repeated verbatim her assessment of D-STAR's termination settlement proposal from her March 2019 final decision (*id.* at 1813-14). The contracting officer also addressed the costs not relating to the termination settlement proposal. First, the contracting officer denied D-STAR's request for additional settlement costs because she concluded that she already reviewed and rejected these costs in her March 2019 final decision (*id.* at 1814). Second, the contracting officer denied D-STAR's request for clean-up costs because it was based on a "verbal agreement" with a former D-STAR employee and there was not adequate support for the claimed costs (*id.*). Third, the contracting officer rejected D-STAR's proposed credit for $6,283 and stood by her assessment of G&A costs from her March 2019 final decision (*id.* at 1815). Fourth, the contracting officer denied D-STAR's request for $119,828 in estimated costs incurred between submitting its February 2018 certified claim and its August 2019 claim, because these costs were permitted by neither the contract's termination provision nor the cost principle that disallows costs for prosecution of claims against the Federal government (*id.* at 1815 (citing FAR 52.249-6 and FAR 31.205-47(f)(1))). Fifth, the contracting officer denied D-STAR's request for CDA interest on its claim because any "amount due [was] yet to be determined" and that should be left to the Board (R4, tab 39 at 1815). Sixth, the contracting officer denied D-STAR's $194,033 request for penalty costs because "they are unsupported and not provided for under FAR Part 49 or FAR 52.249-6" (R4, tab 39 at 1815). Thus, the contracting officer again concluded that D-STAR owed the government $326,583 (*id.*).

On December 18, 2020, D-STAR moved to withdraw its appeal in ASBCA No. 61947, which we dismissed with prejudice on January 13, 2021. *D-STAR Eng'g Corp.*, ASBCA No. 61947, 2021 WL 753666 (Jan. 13, 2021).

On January 10, 2021, D-STAR timely appealed the November 2020 contracting officer's final decision to this Board, which we docketed as ASBCA No. 62780 and consolidated with ASBCA No. 62075. On February 16, 2021, D-STAR filed its complaint in this new appeal – ASBCA No. 62780 – seeking the same costs from its August 2020 certified claim totaling $917,360 (Feb. 2021 compl. at 12).

13

In April 2021, DCMA moved to partially dismiss D-STAR's complaint regarding its claim seeking a $194,033 penalty for the government's alleged "unreasonable delays and inappropriate actions that . . . caused considerable harm" to D-STAR. *D-STAR Eng'g Corp.*, ASBCA Nos. 62075, 62780, 21-1 BCA ¶ 37,943 at 184,290. We granted the motion in October 2021, since the "penalty" effectively sought punitive damages, and dismissed the portion of D-STAR's complaint regarding those costs. *Id.* at 184,291.[7] D-STAR's remaining costs and the government debt demand remain to be determined in this decision.

## DECISION

### I.    *Standard of Review*

Board Rule 11 allows the parties to waive a hearing and submit their appeal on the record. Board Rule 11(a); *Consorzio Stabile GMG S.C.A.R.L.*, ASBCA No. 62753, 23-1 BCA ¶ 38,347 at 186,213. Under Board Rule 11, we may weigh the evidence, including resolving any disputed facts in making our findings of fact and rendering a decision. *Consorzio*, 23-1 BCA ¶ 38,347 at 186,213. We conduct a *de novo* review without deference to the contracting officer's final decisions. *Dep't of Transp. v. Eagle Peak Rock & Paving, Inc.*, 69 F.4th 1367, 1374-76 (Fed. Cir. 2023); 41 U.S.C. § 7103(e); ASBCA Rule 10(c), (d).

DCMA's debt demand for repayment from D-STAR constitutes a government claim. *Eyak Servs., LLC*, ASBCA No. 58556, 14-1 BCA ¶ 35,570 at 174,327 (noting that a debt claim "to recover amounts paid to a contractor that the contractor was not entitled to receive" constitutes a government claim per FAR Part 32.6); *see also Creative Mgmt. Servs., LLC v. United States*, 989 F.3d 955, 962-63 (Fed. Cir. 2021) (stating that debt demand offsetting termination settlement proposal costs constituted a government claim), *overruled, in part, on other grounds*, *ECC Int'l Constructors, LLC v. Sec'y of Army*, 79 F.4th 1364, 1372-73 (Fed. Cir. 2023). Generally, as the proponent of the claim, DCMA bears the burden of proof by a preponderance of the evidence. *Consorzio*, 23-1 BCA ¶ 38,347 at 186,213. However, as to the question of determining cost reasonableness under the FAR's cost principles, the contractor retains the burden of proof even for a government claim. *Northrop Grumman Corp.*, ASBCA No. 62165, 23-1 BCA ¶ 38,394 at 186,557 (contractor challenging government claim still had burden of proof regarding cost reasonableness); FAR 31.201-3(a) ("No presumption of reasonableness shall be attached to the incurrence of costs by a

---

[7] The government's motion also sought to dismiss other requests for compensation on the basis that they had not been submitted to the contracting officer. We deferred deciding this portion of the motion until we considered the merits. *D-STAR*, 21-1 BCA ¶ 37,943 at 184,291. Due to the posture of this case and our decision below, we need not return to the deferred portion of the motion today.

contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.").

D-STAR is the proponent of the claim for additional costs sought in the August 17, 2020 certified claim and, thus, bears the burden of proof for those costs. *FlightSafety Int'l, Inc.*, ASBCA No. 62659, 23-1 BCA ¶ 38,245 at 185,709, *aff'd*, 130 F.4th 926 (Fed. Cir. 2025).

II.     *DCMA's Debt Demand for Payment*

DCMA demands D-STAR pay a debt of $337,463, asserting that the government overpaid D-STAR for the following five types of costs on the contract: (1) direct labor costs; (2) indirect factory expenses; (3) G&A expenses; (4) fee; and (5) settlement expenses (gov't br. at 5-7). The contract includes the Allowable Costs and Payment clause and the Termination (Cost-Reimbursement) clause, each of which subjects recovery of costs to the cost principles in FAR Part 31.2. FAR 52.216-7(a)(1) (incorporated by reference at R4, tab 1 at 13); *see also* FAR 52.249-6(i) (incorporated by reference at R4, tab 1 at 14). FAR Part 31.2's cost principles permit recovery of "allowable" costs that comply "with all of the following requirements: (1) Reasonableness. (2) Allocability. (3) [Cost Accounting Standards or generally accepted accounting principles]. (4) Terms of the contract. (5) Any limitations set forth in this subpart." *Geren v. Tecom, Inc.*, 566 F.3d 1037, 1040 (Fed. Cir. 2009) (quoting FAR 31.201-2(a)); *Fluor Intercontinental, Inc.*, ASBCA Nos. 62550, 62672, 22-1 BCA ¶ 38,105 at 185,097.

Given the context of a termination for convenience, a termination settlement "must balance strict application of the cost principles with assuring fairness to the contractor terminated for convenience." *Fluor*, 22-1 BCA ¶ 38,105 at 185,098; *see also Nicon, Inc. v. United States*, 331 F.3d 878, 885 (Fed. Cir. 2003) (noting that cost principles are "subject to general principles of section 49.201(a)"). "Cost and accounting data may provide guides, but are not rigid measures, for ascertaining fair compensation." FAR 49.201(c); *see also Fluor*, 22-1 BCA ¶ 38,105 at 185,098. "The use of business judgment, as distinguished from strict accounting principles, is the heart of a settlement." FAR 49.201(a); *see also Codex Corp. v. United States*, 226 Ct. Cl. 693, 698 (1981) (reconciling "the strict standard of allowable costs … and the fairness concept … is a matter primarily within the discretion of the Board of Contract Appeals").

A.   *DCMA Properly Disallowed Some of D-STAR's Direct Labor Costs*

DCMA's contracting officer properly disallowed $62,437 in direct labor costs and only allowed $30,949 for work after the partial stop-work order (R4, tab 37 at 1668, tab 39 at 1813). DCMA asserts that the disallowed costs were unreasonable

(gov't br. at 21-25). D-STAR disagrees (app. br. at 2.23-.24; app. reply br. at 4; R4, tab 38 at 1745-46). We agree with DCMA.

"Cost reasonableness is a 'question of fact.'" *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting *Gen. Dynamics Corp. v. United States*, 410 F.2d 404, 409 (Ct. Cl. 1969)). D-STAR complains that it is unclear what standard DCAA and DCMA used to assess the reasonableness of costs (app. br. at 2.23). But, DCAA used the definition in the FAR: "A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." FAR 31.201-3(a). The FAR includes a non-exclusive list of "considerations and circumstances" in assessing reasonableness:

> (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;
> (2) Generally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations;
> (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and
> (4) Any significant deviations from the contractor's established practices.

FAR 31.201-3(b); *Kellogg*, 728 F.3d at 1359 (recognizing that the language is nonexclusive).

Here, DCMA specifically identified the challenged costs by reviewing timesheets and providing a brief explanation why it found each time entry unreasonable because they were (1) excessive, (2) unauthorized design work after the partial stop-work order, (3) entries without work descriptions, (4) work on unchanged monthly reports, or (5) allegedly resulted in an incomplete draft report (R4, tab 26 at 1453-57, tab 45). DCAA found reasonable only $6,464.17 of these $93,386 in costs (R4, tab 11 at 86, 93). DCMA's contracting officer added an additional $24,485 for half of the labor associated with D-STAR's submission of the draft final report (R4, tab 37 at 1668, tab 39 at 1813). Thus, DCMA found only $30,949 of the costs reasonable (R4, tab 37 at 1668, tab 39 at 1813).

D-STAR has not offered proof to support why the challenged costs are reasonable. As noted above, despite this being a government claim, contracts subject to FAR Part 31.2 place the burden of proof regarding cost reasonableness on the contractor once the contracting officer has "challenged specific costs." *Northrop*, 23-1

16

BCA ¶ 38,394 at 186,557; FAR 31.201-3(a). After D-STAR reviewed DCAA's audit report, it requested a copy of the "detailed spreadsheet referred to in the DCMA Report to DCAA" because it would allow D-STAR to justify those costs and rebut the government's determinations (R4, tab 12 at 119, 156). DCMA provided that detailed spreadsheet as part of the records in this appeal (R4, tab 26), despite D-STAR's assertion in its brief that the agency had not "provided any evidence" regarding the disallowed costs (app. br. at 2.24). Notwithstanding having the government's files explaining the challenged costs, D-STAR has repeated the same generalized justifications for why the costs were reasonable without addressing any of the issues the government raised in the spreadsheets such as missing work descriptions for time entries or why certain costs were not excessive (R4, tab 12 at 157, tab 38 at 1745; app. br. at 2.23-24; app. reply br. at 4). D-STAR has failed to respond to the specific challenges by time entry.

Ultimately, D-STAR has not proved that its disallowed direct labor costs were reasonable. Thus, we conclude that the evidence supports DCMA's disallowance of $62,437 of D-STAR's proposed $504,739 in direct labor costs, resulting in $442,356 allowable direct labor costs from the termination settlement proposal.

B.    *DCMA Has Proved that Some of D-STAR's Indirect Factory Expenses Were Unallowable*

DCMA has proved that $104,344 in indirect factory expenses from D-STAR's termination settlement proposal were unallowable (R4, tab 37 at 1667, tab 39 at 1813-14). DCMA found that D-STAR improperly included materials in its engineering overhead pool (R4, tab 11 at 86). D-STAR contends that it should be paid the full amount sought in its termination settlement proposal because it properly included the materials in its overhead pool (app. br. at 2.25). We disagree.

As we found above, DCMA and DCAA traced $38,366 of materials that the government paid D-STAR on a prior contract (a direct cost), but that D-STAR included in its engineering overhead pool in calculating its termination settlement proposal for this contract (R4, tab 11 at 86, tab 18 at 1064 (D-STAR accounting records regarding materials), tab 29 at 1525, 1530 (D-STAR vouchers/invoices)). D-STAR could not include these directly purchased materials as part of its unused inventory and, thus, in its overhead pool: "When materials are purchased specifically for and are identifiable solely with performance under a contract, the actual purchase cost of those materials should be charged to the contract." FAR 31.205-26(d). And, "the Government acquires title to all property to which the contractor is entitled to reimbursement" on a cost type contract. FAR 45.402(b). D-STAR received reimbursement, so these materials constituted government acquired property (R4, tab 18 at 1064 (D-STAR accounting records regarding materials), tab 29 at 1525, 1530 (D-STAR vouchers/invoices)).

D-STAR contends that it purchased back these materials, so it could properly treat these materials as inventory and part of the engineering overhead pool (app. reply br. at 5-6; R4, tab 12 at 134-37). D-STAR argues that it gave the government a credit for these materials to offset a cost overrun that it incurred performing that prior contract (R4, tab 12 at 134-37). D-STAR points to a voucher that purported to offset the $38,366 in materials against costs incurred "in Excess of Ceiling" of that prior contract (R4, tab 77 at 2910, tab 12 at 136-37). Instead of seeking recovery of the cost overrun, D-STAR asserts it "waived" those allegedly incurred costs exceeding the ceiling (R4, tab 12 at 134). D-STAR admits it never issued a check or other type of payment to the government for these materials (*id.*).

D-STAR could not properly offset the $38,366 in materials against the costs the contractor incurred in excess of the ceiling price. As found above, that prior contract included a Limitation of Cost provision that did not obligate the government "to reimburse the Contractor for costs incurred in excess of . . . the estimated cost specified in the schedule[.]" FAR 52.232-20(d)(1) (incorporated by reference in prior contract at R4, tab 40 at 1833). "The limitation of the government's liability to the estimated cost stated in the contract (unless additional costs are authorized) protects the government from having to pay more than it had anticipated and set aside for the contract if the contractor's costs of performance exceed the estimate." *Advanced Materials, Inc. v. Perry*, 108 F.3d 307, 310 (Fed. Cir. 1997). Because D-STAR was not owed the cost overrun based on the Limitation of Cost clause, there was no money the government owed D-STAR to offset its alleged credit for $38,366 in material costs (R4, tab 77 at 2910-13). D-STAR has failed to rebut the government's evidence showing no credit ever occurred. Thus, DCMA properly removed the materials amount from the engineering overhead pool.[8]

As found above, once $38,366 is removed from the overhead pool, the proper overhead cost rate is 117.29% (R4, tab 11 at 95, tab 37 at 1668, tab 39 at 1813-14).[9]

---

[8] D-STAR neither contends nor has pointed to any evidence that it should have been excused from application of the Limitation of Cost provision and we have not found any basis in the record. *See Int'l Sci. & Tech. Institute, Inc. v. United States*, 53 Fed. Cl. 798, 806 (2002) (discussing circumstances that may excuse a contractor from compliance with and application of a Limitation of Cost provision), *aff'd*, 95 F. App'x 358 (Fed. Cir. 2004); *see also Parsons-UXB J.V.*, ASBCA No. 56481, 13 BCA ¶ 35,378 at 173,595 (same).

[9] D-STAR notes that its indirect cost proposals were accepted for calendar years 2011 and 2012 as a defense of its calculations for calendar year 2013 (app. supp. R4, tab 35; app. reply at A.4). However, DCAA had questioned the overhead pool and rate for calendar year 2013 as part of its audit, and the record includes no indication the government ever accepted D-STAR's 2013 indirect cost proposal

As we found above, DCMA properly applied that rate to the allowed direct labor costs ($442,356), resulting in disallowance of $104,344 in indirect factory expenses of the $623,183 D-STAR proposed in its termination settlement proposal (R4, tab 37 at 1667). Thus, DCMA has proved that these costs were properly found unallowable and that $518,839 were allowable indirect factory expenses from D-STAR's termination settlement proposal.

C.     *DCMA Has Proved that D-STAR's G&A Expenses that it Challenged were Unallowable*

DCMA asserts that it acted properly by finding $61,243 in G&A expenses from D-STAR's termination settlement proposal unallowable (gov't br. at 31-35). D-STAR asserts that DCMA's conclusions are "not substantiated by any facts," triple-count subtracted costs, and that these G&A expenses should have been allowed (app. br. at 2.25; app. reply br. at 7-8). DCMA has proved that these costs should be disallowed.

DCMA has shown that D-STAR improperly included $36,237 in long-range planning costs in its G&A expenses to calculate its G&A rate for calendar year 2013 because the costs were (1) unsupported or (2) included burden on G&A expenses (R4, tab 11 at 86, 96-97). DCMA has also shown that D-STAR improperly included $7,194 in its IR&D and B&P costs (gov't br. at 34).

First, a contractor must show its "costs were allowable by 'accounting for costs appropriately and . . . maintaining records, including supporting documentation." *Strategic Tech. Institute, Inc. v. Sec'y of Defense*, 91 F.4th 1140, 1142 (Fed. Cir. 2024) (quoting FAR 31.201-2(d)). "The contracting officer may disallow all or part of a claimed cost that is inadequately supported." FAR 31.201-2(d); *see also Int'l Dev. Solutions, LLC v. Sec'y of State*, 105 F.4th 1375, 1377 (Fed. Cir. 2024). DCAA reviewed D-STAR's records, questioned the allowability of $4,944 in long-range planning costs because the agency could find no supporting documentation for the costs, and DCMA's contracting officer disallowed the costs based on DCAA's recommendation (R4, tab 11 at 94-97, tabs 15-17, tab 37 at 1688, tab 39 at 1814). D-STAR has provided no records supporting that it incurred these costs and, thus, DCMA has proved that these costs were properly disallowed.

Second, a contractor may not add burden (overhead and G&A) to costs it has already characterized as indirect G&A expenses. "G&A costs are indirect expenses that are not identifiable with any particular cost objective but that are necessary to the

---

(R4, tab 11 at 94). Moreover, DCAA's failure to challenge a claimed cost one year, without more, does not preclude it from challenging it in later years. *Tech. Sys., Inc.*, ASBCA No. 59577, 17-1 BCA ¶ 36,631 at 178,387-88.

overall operation of the business." *Advanced Materials, Inc. v. United States*, 54 Fed. Cl. 207, 212 (2002); FAR 2.101 (defining a G&A expense as "any management, financial, and other expense which is incurred by or allocated to a business unit and which is for the general management and administration of the business unit as a whole"). Here, D-STAR incurred indirect overhead and G&A expenses on its long-range planning costs (R4, tab 22 at 1402-03). D-STAR then inappropriately added burden to these indirect costs (R4, tab 11 at 97, tab 30 at 1589). D-STAR could not add burden to these indirect costs as if they were direct costs. *Cf.* FAR 31.202(a); FAR 31.203(b). While D-STAR complains that the government has failed to explain its calculations, DCMA relies on record evidence to explain and support the disallowance (R4, tab 11 at 97, tab 30 at 1589). DCAA properly recalculated the proper amounts and DCMA disallowed that amount of double-counted burden: $31,293 (R4, tab 11 at 97, tab 30 at 1589, tab 37 at 1668, tab 39 at 1814).

Third, DCMA has shown that it properly recalculated the IR&D and B&P costs based on applying the corrected engineering overhead rate, as discussed above (gov't br. at 34-35). D-STAR applied its proposed 124.18% engineering overhead rate to its IR&D and B&P direct labor costs in its 2013 indirect cost proposal (R4, tab 23 at 1406, 1412). As found above, however, the engineering overhead rate for calendar year 2013 should have been 117.29% (R4, tab 37 at 1668, tab 39 at 1813-14, tab 11 at 95). Applying the proper engineering overhead rate of 117.29% to the IR&D and B&P costs (R4, tab 23 at 1406), D-STAR overstated its IR&D and B&P costs by $7,194 (gov't br. at 34).[10]

DCMA has also shown that it properly removed the disallowed long-range planning and IR&D and B&P costs from the D-STAR's proposed G&A pool ($693,173 – 43,431 = $649,742), divided it by the total cost input base as modified by these changes to D-STAR's proposed total cost input base ($1,883,653), which results in a 34.49% G&A rate (gov't br. at 34-35; R4, tab 23 at 1404 (specifying D-STAR's proposed G&A pool and base). DCMA has also shown that applying this 34.49% G&A rate to the allowable contract costs from the termination settlement proposal (direct costs, direct labor, indirect factory expense, and other costs totaling $2,129,007), results in allowing $734,295, and disallowing $61,243, in G&A costs (R4, tab 37 at 1667 (listing allowable costs; gov't br. at 35). Thus, DCMA has proved that it properly disallowed $61,243 in D-STAR's proposed $795,538 in G&A costs and, thus, we find allowable $734,295 in G&A costs.

---

[10] DCMA's contracting officer disallowed $9,600 in her final decisions (R4, tab 37 at 1668, tab 39 at 1814). However, the contracting officer accidentally included travel costs that she had allowed as part of her calculation (gov't br. at 34). When the travel costs are removed, the correct calculation is $7,194 (*id.*).

## D. *DCMA Should not Have Disallowed $54,779 for the Fee*

DCMA asserts that it properly applied a straight-line method for calculating the percentage of contract completion using the ratio of incurred costs to the total estimated costs, resulting in disallowing $54,779 of D-STAR's fee (gov't br. at 36-37). D-STAR asserts that the contracting officer should have allowed the company to use a double-declining method for calculating the fee, resulting in accelerated recovery because of the unrecovered start-up costs of performing this research and development contract (app. br. at 2.26; app. reply at 9; R4, tab 38 at 1758-59). The law supports D-STAR's position, not DCMA's.

Generally, the termination contracting officer "shall determine the adjusted fee to be paid, if any, in the manner provided by the contract." FAR 49.305-1(a). "Contract interpretation begins with the language of the written agreement." *NOAA Md., LLC v. Adm'r of Gen. Servs. Admin.*, 997 F.3d 1159, 1165 (Fed. Cir. 2021) (quoting *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)); *Konecranes Nuclear Equip. & Servs., LLC*, ASBCA Nos. 62797, 62827, 24-1 BCA ¶ 38,586 at 187,555. If unambiguous, the plain meaning of a contract controls. *Boeing Co. v. Sec'y of Air Force*, 983 F.3d 1321, 1326 (Fed. Cir. 2020); *Hercules, Inc. v. United States*, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002) ("In contract interpretation, the plain and unambiguous meaning of a written agreement controls." (internal citation omitted)).

Here, the contract states: "As determined by the contracting officer, [the fee] shall be paid as it accrues, in regular installments based upon the percentage of completion of work" (R4, tab 1 at 3). The contract also states: "If the contract is terminated for the convenience of the Government, the settlement shall include a percentage of the fee equal to the percentage of completion of work contemplated under the contract . . . less previous payments for fee." FAR 52.249-6(h)(4)(i) (incorporated by reference in contract, R4, tab 1 at 14). From the government's perspective, accelerating payment of the fee as D-STAR proposed, would contradict the contract's requirement that fee payment "be paid as it accrues," which suggests a straight-line requirement and using a 9.25% fee throughout contract performance (gov't br. at 36-37). However, the government's reliance on only a straight-line method results in concluding that the "percentage of completion of work" should be calculated as the ratio of costs incurred to the estimated costs of performing the contract. Indeed, every time that DCAA or DCMA calculated the percentage of completion it relied on this ratio (R4, tab 11 at 98-99, 104 (DCAA audit report and DCMA technical analysis), tab 37 at 1667-68 (contracting officer's final decision)).

The government's narrow reading of the term "percentage of completion of work" contradicts the FAR, which states: "The ratio of costs incurred to the total estimated cost of performing the contract or the terminated portion is only one factor

21

in computing the percentage of completion." FAR 49.305-1(b); *see also Sys. Dev. Corp.*, ASBCA No. 16947, 73-1 BCA ¶ 9788 at 45,738 ("The fixed fee relates to the degree of completion of the work not to the incurred costs."). Here, as found above, the government used this ratio as the only factor in computing the percentage completion of work in assessing the termination settlement proposal.

The FAR requires a broader measure in assessing the "percentage of completion of work," particularly given the FAR's requirement that a termination for convenience should ensure "fair compensation" and not just rigidly rely on cost and accounting data. FAR 49.201(c); *see also Fluor*, 22-1 BCA ¶ 38,105 at 185,098. In computing the "percentage completion of work" in a terminated contract, the FAR states:

> [F]actors such as the extent and difficulty of the work performed by the contractor (e.g., planning, scheduling, technical study, engineering work production and supervision, placing and supervising subcontracts, and work performed by the contractor in (1) stopping performance, (2) settling terminated subcontracts, and (3) disposing of inventory) shall be compared with the total work required by the contract or by the terminated portion.

FAR 49.305-1(a); (app. br. at 2.26; R4, tab 38 at 1758-59). The government discounted this broader standard and, thus, misconstrued the term "percentage of completion of work." *Cf. Lockheed Martin Corp. v. England*, 424 F.3d 1199, 1205 (Fed. Cir. 2005) (discussing another part of FAR 49.305-1 and concluding that "we are not persuaded that the provision should be interpreted in a way that contradicts its plain meaning"). D-STAR has shown that the early termination prevented the contractor from fully recovering the financial investments it anticipated recovering over the full contract (R4, tab 12 at 150-51). These unrecovered costs should have been factored into calculation of the "percentage of completion of work" in calculating the fee.

Ultimately, the government has failed to prove that the fee it awarded constituted fair compensation as part of the termination settlement[11] and, because the

---

[11] We have applied a *de novo* standard of review to the fee determination, because the contracting officer's determination of the percentage of completed work for a fixed fee is different than an award deciding official's determination of an award fee or award term, which is reviewed for abuse of discretion. *Burnside-Ott Aviation Training Ctr v. Dalton*, 107 F.3d 854, 859-60 (Fed. Cir. 1997); *CI², Inc.*, ASBCA No. 56257, 11-2 BCA ¶ 34,823 at 171,354. However, even

burden of proof in this appeal falls on the government, we rule for D-STAR on the fee issue. *See Eyak Servs., LLC*, 14-1 BCA ¶ 35,570 at 174,328 ("Because these appeals are from government claims, the government bears the burden of proof."); *see also Emerson Elec. Co.*, ASBCA No. 15591, 72-1 BCA ¶ 9440 at 43,836 (denying the government's reduction of a fee in a termination for convenience case because the government had failed to meet its burden of proof).

### E. *DCMA Properly Disallowed Some of D-STAR's Settlement Costs*

DCMA asserts that it appropriately disallowed $482,849 in settlement expenses and found only $144,805 as reasonable and allowable (gov't br. at 37-48). D-STAR asserts that it provided sufficient information to justify its costs and that the government "has not provided any reasons, or even supporting calculations, to arrive" at its disallowance of these costs (app. br. at 2.26-2.32; app. reply br. at 9-14). DCMA properly disallowed these costs.

The contract's Termination (Cost-Reimbursement) clause and the incorporated cost principles – particularly, the termination cost principle – permit recovery of settlement expenses. FAR 52.249-6(h) (incorporated by reference in the contract, R4, tab 1 at 14); FAR 31.205-42(g). Again, because DCMA has challenged the specific settlement costs as unreasonable, FAR Part 31.2 places the burden of proof regarding cost reasonableness on the contractor once the contracting officer has identified the challenged costs. *Northrop*, 23-1 BCA ¶ 38,394 at 186,557; FAR 31.201-3(a). DCMA challenged the direct labor included as part of the settlement costs and lowered the burden rate applied to those costs based on the FAR's termination cost principle (R4, tab 11 at 99-100, 106, tab 37 at 1669, tab 39 at 1814).

First, DCMA concluded that only $44,276.31, representing 681.35 direct labor hours, was fair and reasonable for the settlement costs (R4, tab 11 at 106, tab 37 at 1669, tab 39 at 1814). D-STAR complains that DCMA has made "only generic assertions about 'excessive' and 'unreasonable' [costs], and has <u>not</u> challenged any <u>specific</u> labor hours" (app. reply at 10 (emphasis in original)). To the contrary, DCMA has provided detailed records of its review of D-STAR's time sheets and records, going line-by-line explaining why the specific time entries it challenged were unreasonable (R4, tab 35 at 1643-50). For example, D-STAR sought to recover costs of spending 1,187.7 hours for entering 129 inventory items into DCMA's Plant Clearance Automated Reutilization Screening System, which amounts to approximately 9.2 hours for every entry into the database (R4, tab 11 at 105-06, tab 37 at 1669, tab 39 at 1814). Yet, the record supports DCMA's position that D-STAR needed significantly less time to complete this post-termination activity and DCMA

if we applied that more deferential abuse of discretion standard, we would still hold that the government failed to meet its burden of proof.

23

correctly lowered the number of allowable hours to 317.95 hours (app. supp. R4, tab 31 at 14; R4, tab 35 at 1647).

Notwithstanding DCMA providing the underlying documentation supporting its reasonableness determination in the Rule 4 file in this appeal, D-STAR still has not rebutted the government's position (R4, tab 38 at 1746-49). Even as D-STAR incorrectly complains that DCMA has not been specific enough, D-STAR only relies on general statements of why it should receive these costs without connecting those statements to why each disallowed hour should be found reasonable (R4, tab 12 at 170-73; app. reply br. at 11). For example, in response to DCMA's unreasonableness determination regarding D-STAR's entry of inventory items into the government's database, D-STAR asserts that some of these hours could be justified by other activities, such as (1) understanding the FAR's termination procedures, (2) communicating with the termination contracting officer seeking guidance, (3) unsuccessfully searching for suitable attorneys and consultants, (4) preparing and revising D-STAR's settlement estimate and four iterations of D-STAR's termination settlement proposal, (5) working with the government to secure International Traffic in Arms regulated data and project-related hardware, (6) disposing of government hardware, and (7) responding to the government's audit of the proposal (app. br. at 2.28-2.30; R4, tab 12 at 170-73). However, as DCMA points out, D-STAR included separate time entries for these other activities, DCMA separately evaluated these costs for reasonableness and allowability, and found 363.4 hours reasonable for these activities (gov't br. at 42; R4, tab 35 at 1644-46, tab 37 at 1669). In any event, D-STAR has failed to rebut DCMA's reasonableness determinations.

Second, the government assessed and lowered D-STAR's proposed burden (both engineering overhead and G&A), resulting in only allowing $32,364 in overhead costs and $14,835 in G&A costs (R4, tab 37 at 1669, tab 39 at 1814). On appeal, DCMA argues that it erred in allowing any of the $14,835 in G&A costs (gov't br. at 47). D-STAR proposed including its full burden for its settlement costs (R4, tab 11 at 100). However, while the FAR allows recovery of "[i]ndirect costs related to salary and wages incurred as settlement expenses . . .; normally, such indirect costs shall be limited to payroll taxes, fringe benefits, occupancy costs, and immediate supervision costs." FAR 31.205-42(g)(1)(iii); *Alfair Dev. Co.*, ASBCA Nos. 53119, 53120, 05-2 BCA ¶ 32,990 at 163,516. The government recognized this limitation in applying engineering overhead to the settlement direct labor costs but argues it mistakenly applied the full G&A rates (without similarly limiting it) to the settlement costs (R4, tab 11 at 100, tab 23 at 1410, tab 33 at 1621-23, 1633-35).

D-STAR asserts that the government bears the responsibility for D-STAR's failure to segregate these costs because the termination contracting officer did not provide the "detailed briefing" allegedly required by FAR 49.105 (app. br. at 1.3, 2.2-2.4; app. reply br. at 14). The FAR advises that the termination contracting officer

"should promptly hold a conference with the contractor" and discuss a list of topics relevant to the termination but does not require a "detailed briefing."  FAR 49.105(c). Here, DCMA's termination contracting officer discharged this duty to D-STAR, providing guidance and the specific regulations regarding how to prepare the termination settlement proposal, answering questions from D-STAR about specific termination settlement issues, and discussing the draft termination settlement proposal with D-STAR by telephone (app. supp. R4, tabs 24, 26).  Indeed, DCMA specifically provided the full provision of FAR 31.205-42, including the section limiting G&A, to D-STAR and directed the contractor to review it in preparing the termination settlement proposal (app. supp. R4, tab 24 at 1-2, 6-7).  D-STAR cannot shift responsibility to DCMA for failing to follow the guidance provided.[12]

D-STAR also asserts that it should have been able to charge its fully burdened rates to the settlement costs because the termination cost principle only "normally" applies and that implies the FAR "allows alternate methods of accumulating costs if . . . fair and reasonable" (app. reply br. at 9).  However, we have disallowed contractor recovery of G&A settlement costs where the contractor "did not segregate non-allowable G&A costs from those allowable under" FAR 31.205-42(g)(1)(iii).  *Alfair Dev.*, 05-2 BCA ¶ 32,990 at 163,516; *see also Info. Sys. & Networks Corps.*, ASBCA No. 42659, 00-1 BCA ¶ 30,665 at 151,425 ("[W]e are unable to sustain their allowance because of the limitations of FAR 31.205-42(g)[(1)](iii).").  Here, D-STAR did not segregate non-allowable indirect costs in applying G&A to its settlement costs. D-STAR has offered no rationale for departing from the normal limitations on recovering G&A for settlement costs.  Thus, we deny recovery for the G&A costs and limit engineering overhead to the rate that follows the limitations of FAR 31.205-42(g)(1)(iii).  In total, the allowable settlement costs are $129,970.

---

[12] D-STAR also asserts more generally that the government did not act swiftly to consummate a settlement when presented with the termination settlement proposal (app. br. at 2.11).  The FAR mandates that the termination contracting officer "shall [p]romptly negotiate settlement with the contractor and enter into a settlement agreement[.]"  FAR 49.105(a)(3).  However, "[i]f the [termination contracting officer] suspects fraud or other criminal conduct related to the settlement of a terminated contract, the [termination contracting officer] shall discontinue negotiations and report the facts under agency procedures."  FAR 49.106.  Here, the government delayed negotiation of a settlement with D-STAR because it was investigating some of the costs at issue for fraud (R4, tabs 47-50-51, 55, *see supra* note 2).  "[T]he same body of law which directs a [contracting officer] to settle a [termination settlement proposal] also prohibits negotiation under circumstances involving fraud."  *Medina Constr., Ltd. v. United States*, 43 Fed. Cl. 537, 549 (1999).

Based on the assessment of the various costs on appeal, we arrive at the final calculation of damages based on the allowable costs from D-STAR's termination settlement proposal (including the undisputed and disputed costs):

| Cost Element | Board Decision |
|---|---|
| Direct Material | $193,135 |
| Direct Labor | 442,356 |
| Indirect Factor Expense | 518,839 |
| Other Costs | 974,677 |
| Subtotal | $2,129,007 |
| G&A Expense | 734,295 |
| Total Costs | $2,863,302 |
| Fee | 319,392 |
| Settlement Expenses | 129,970 |
| Settlement with Subcontractors | 1,350 |
| Gross Proposed Settlement | $3,314,014 |
| Disposal & Other Credits | (213) |
| Net Proposed Settlement | $3,313,801 |
| Prior Payments to Contractor | 3,596,727 |
| Net Payment Requested | ($282,926) |

Taken together, we sustain the DCMA's debt demand claim in the amount of $282,926, plus any interest due under the Interest clause, FAR 52.232-17 (OCT 2010) (incorporated in the contract by reference at R4, tab 1 at 14). *See Fru-Con Constr. Corp.*, ASBCA No. 55197, 07-2 BCA ¶ 33,697 at 166,820. DCMA shall also provide an equitable interest credit because the amount due has been reduced on appeal. FAR 32.608-2(a)(1) ("An equitable interest credit shall be applied under the following circumstances: When the amount of debt initially determined is subsequently reduced; *e.g.*, through a successful appeal."); FAR 52.232-17(g) ("The interest charge made under this clause may be reduced under the procedures prescribed in 32.608-2 of the Federal Acquisition Regulation in effect on the date of this contract."). Correlatively, we deny D-STAR's claim relating to its termination settlement proposal. Thus, we partially deny D-STAR's appeal in ASBCA No. 62075 (and ASBCA No. 62780, to the extent D-STAR seeks these same costs in that appeal and challenge the debt demand), and partially grant D-STAR's appeal to the extent we have reduced DCMA's debt demand from $337,463 to $282,926.

III.    *D-STAR's Claim for Additional Costs*

D-STAR seeks additional costs beyond those from its termination settlement proposal, including (1) $70,567 for D-STAR's costs incurred responding to government audits and providing information supporting its termination settlement

proposal from submission of the proposal through its February 2018 certified claim, (2) $13,090 in clean-up costs, (3) $119,828 in "Estimated costs incurred" by D-STAR after it filed its February 2018 certified claim, (4) $83,342 in interest for the above claims from the time it submitted its July 2015 draft termination settlement proposal through August 2020, and (5) the $194,033 "[p]enalty, at the standard of 6% per annum, for [the] Government's unreasonable delays and inappropriate actions that have caused considerable harm" (R4, tab 38 at 1672). As noted above, we previously dismissed D-STAR's request for a penalty, so that portion of the claim is no longer at issue in these appeals. *D-STAR Eng'g*, 21-1 BCA ¶ 37,943 at 184,291. We now turn to D-STAR's other costs.[13] As noted above, D-STAR bears the burden of proof as the proponent of this claim. *FlightSafety*, 23-1 BCA ¶ 38,245 at 185,709.

A.   *Settlement Costs Incurred from Termination Settlement Proposal Certified Claim*

As noted above, a contractor can recover its settlement costs in negotiating the termination settlement proposal per the Termination (Cost-Reimbursement) clause of the contract. FAR 52.249-6(h)(3)(i) (incorporated by reference in the contract, R4, tab 1 at 14) (allowing the "reasonable costs of settlement of the work terminated, including . . . [a]ccounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data"); FAR 31.205-42(g)(1)(i) (same).

D-STAR seeks $70,567 for its costs incurred between submitting its termination settlement proposal and submitting its February 2018 certified claim (app. br. at 2.15; R4, tab 38 at 1681-84). D-STAR included time entries with descriptions of daily labor hours worked, rate for each hour, and an added G&A cost to those direct labor costs (R4, tab 14 at 184-86, tab 38 at 1682-84). DCMA asserts that these additional settlement expenses are not recoverable because (1) D-STAR's time records do not substantiate the requested costs, (2) even if recoverable, some of the costs relate to unrecoverable costs for preparing D-STAR's certified claim, (3) the contracting officer already allowed $25,000 of additional settlement expenses that should cover these costs, and (4) the G&A costs added to the direct labor are limited by the termination cost principle, FAR 31.205-42(g)(1)(iii) (gov't br. at 49-54).

First, DCMA asserts that D-STAR has not substantiated these costs because D-STAR's records insufficiently demonstrate it incurred these costs (gov't br.

---

[13] The contracting officer's final decision rejected D-STAR's offered credit of $6,283, standing by its own calculation of G&A costs (R4, tab 39 at 1815). On appeal, DCMA has not sought to use this credit to prove its claim or reduce D-STAR's claim. Thus, DCMA has abandoned this issue. *Mindseeker, Inc.*, ASBCA No. 63197, 24-1 BCA ¶ 38,666 at 187,964.

27

at 50-51).  DCMA points to the FAR's requirement that a contractor provide "supporting documentation, adequate to demonstrate that costs claimed have been incurred."  FAR 31.201-2(d); *see also Strategic Tech.*, 91 F.4th at 1142; *Int'l Dev. Solutions*, 105 F.4th at 1377.  DCMA asserts that D-STAR's time entries are not sufficient, pointing to *Bannum, Inc. v. United States*, 151 Fed. Cl. 755, 765-66 (2021).  There, the court found a spreadsheet with the estimated number of hours by task taken from the firm's general ledger was insufficient to support termination costs.  *Id*.  Here, however, D-STAR has provided time entries, accompanied by descriptions of what tasks were performed, the date a task was performed, and the hourly-rate for D-STAR's president and former employees acting as consultants as part of its certified claim (R4, tab 14 at 184-86, tab 38 at 1682-84).  Moreover, DCAA assessed these same employees and consultants in its audit of records regarding the settlement costs in its termination settlement proposal (discussed above) (R4, tab 35 at 1651-62).  We have approved similar detail of direct labor as sufficient to meet a contractor's burden of proof that it incurred direct labor costs.  *Optical E.T.C., Inc.*, ASBCA No. 53350, 04-1 BCA ¶ 32,608 at 161,380-81, 161,385 ("find[ing] that the claimed costs are supported" based on date of performance, description of services, and amount, resulting in awarding costs to the extent they related to settlement expenses and not claim preparation); *see also Mediax Interactive Tech., Inc.*, ASBCA No. 43961, 99-1 BCA ¶ 30,318 at 149,925, 149,930-31 (allowing direct labor costs based on similar types of records).  Indeed, sometimes less detail.  *Derian, Inc.*, ASBCA No. 62957, 23-1 BCA ¶ 38,425 at 186,753 (permitting recovery where the contractor could only provide monthly timecards without describing "the type of work performed or any proof of payment").  Thus, D-STAR has provided sufficient documentation to prove it incurred these costs.

Second, even if D-STAR incurred these costs, DCMA still asserts that D-STAR may not recover costs relating to its time preparing its certified claim, which it argues are not related to the negotiation of its termination settlement proposal (gov't br. at 52-53).  The FAR makes unallowable any costs incurred for "the prosecution of claims or appeals against the Federal Government."  FAR 31.205-47(f)(1).  To determine whether a cost is an allowable administrative cost of pursuing settlement or an unallowable cost of pursuing a claim we objectively look at costs to see "if a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the Government[.]"  *Tip Top Constr., Inc. v. Donahoe*, 695 F.3d 1276, 1283-84 (Fed. Cir. 2012) (quoting *Bill Strong Enters., Inc. v. Shannon*, 49 F.3d 1541, 1549-50 (Fed. Cir. 1995), *overruled, in part, on other grounds*, *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) (*en banc*)); *see also Derian*, 23-1 BCA ¶ 38,425 at 186,754.  Here, DCMA challenges D-STAR's incurred costs for time between receiving the agency's debt demand letter (February 12, 2018) and submitting its first certified claim (February 27, 2018).  D-STAR's time entries for these hours state:  "Research FARS, history of actions;" or prepare D-STAR's "position" in response to the debt demand that resulted in its first certified claim (R4, tab 14 at 186;

28

tab 38 at 1684).  These actions directly relate to D-STAR's preparation of its certified claim and we deem these costs unallowable ($12,637.02) from February 13, 2018, through February 27, 2018.  *Alfair Dev.*, 05-2 BCA ¶ 32,990 at 163,517 (disallowing costs "for the purpose of developing claims").

Third, DCMA asserts that any award of these additional settlement costs should be reduced by $25,000 because the contracting officer already credited that amount to D-STAR in calculating the debt demand in the final decisions (gov't br. at 53-54).  In her decisions, the contracting officer "allowed $25,000 to capture any additional costs incurred from audit issuance [December 19, 2016] date to present [March 18, 2019]" (R4, tab 37 at 1669, tab 39 at 1814).  That period overlaps, in part, with the period for which D-STAR seeks these additional settlement costs – November 2015 through February 2018 (R4, tab 14 at 184-86, tab 38 at 1682-84).  Thus, we agree that D-STAR's recovery for these additional settlement costs should be reduced by $25,000.[14]

Fourth, DCMA asserts that D-STAR may not recover the G&A ($16,657.82) for these additional settlement costs because the FAR cost principles limit the types of indirect costs that can be recovered as part of termination settlement costs and D-STAR again failed to segregate those costs in its claim (gov't br. at 54).  For the same reasons discussed above, D-STAR may not recover these costs because it failed to remove the unallowable costs from its calculation.  FAR 31.205-42(g)(1)(iii); *Alfair Dev.*, 05-2 BCA ¶ 32,990 at 163,516; *see also Info. Sys. & Networks*, 00-1 BCA ¶ 30,665 at 151,425.

Ultimately, we determine that D-STAR may recover $16,272.16 in additional settlement costs.  We derived this amount by subtracting $25,000 already credited by the government in its debt demand claim, $16,657.82 of unallowable G&A, and $12,637.02 of unallowable costs in preparing the certified claim, from the $70,567 that D-STAR's claim seeks in additional settlement costs.

B.    *Clean-up Costs*

D-STAR seeks $13,090 in clean-up costs based on an alleged "verbal contract" for $10,000 promised to a former employee for cleaning up "the mess created by the disposition of inventory of the terminated contract, such as by disassembly, shipping, etc.," and G&A for these costs (R4, tab 38 at 1685; app. br. at 2.32-.33).  DCMA asserts that D-STAR has failed to provide evidence of the existence of a contract for

---

[14] DCMA asserts that the $25,000 allowed by the contracting officer was "generous" (gov't br. at 53-54).  As noted above, far from being generous, D-STAR's records prove it incurred more settlement costs than what the contracting officer allowed.

these services and, even if there was a contract, has failed to provide evidence and proof of damages (gov't br. at 58-59). We agree with DCMA.

D-STAR has alleged, but has not provided any evidence that it had a "verbal contract" to perform these services. This subcontract either is an oral express subcontract or implied-in-fact subcontract. Regardless, "[t]he elements of an implied-in-fact contract are the same as those of an oral express contract." *Night Vision Corp. v. United States*, 469 F.3d 1369, 1375 (Fed. Cir. 2006). An implied-in-fact or oral express subcontract between two private parties requires proof of (1) unambiguous offer and acceptance, (2) mutuality of intent to contract, and (3) consideration. *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1293-94 (Fed. Cir. 2022); *Balimoy Mfg. Co. of Venice, Inc.*, ASBCA No. 48899, 97-1 BCA ¶ 28,803 at 143,671. D-STAR bears the burden of proving that it entered a subcontract for these clean-up services. *Balimoy Mfg.*, 97-1 BCA ¶ 28,803 at 143,671.

There was no consideration for D-STAR's promise and, thus, no binding contractual agreement was formed between the parties. D-STAR's president promised the former employee that he would pay him *after* the former employee performed these clean-up activities (R4, tab 38 at 1685; app. br. at 2.32-.33). The former employee's clean-up work constituted past consideration and could not serve as the basis for a new contractual obligation based on the promise to pay $10,000 after-the-fact. "[P]ast consideration is no consideration." *Bogley's Estate v. United States*, 514 F.2d 1027, 1033 (Ct. Cl. 1975); *Gen. Bronze Corp. v. United States*, 338 F.2d 117, 185 (Ct. Cl. 1964) ("[S]omething which has been given before the promise was made and, therefore, without reference to it, cannot, properly speaking, be legal consideration." (quoting 1 WILLISTON ON CONTRACTS § 142 (3d ed. 1957)); *Sager v. Basham*, 401 S.E.2d 676, 677 (Va. 1991) ("When . . . a service has been rendered before a promise was made, the prior service is not a sufficient consideration to support the promise.").

Moreover, even if a subcontract was formed, D-STAR has failed to prove its damages. D-STAR's president estimated that these services were worth $10,000, but the former employee neither recorded the time it took to complete the clean-up services nor submitted a bill for these services after completing them (R4, tab 38 at 1685; app. br. at 2.32-.33). D-STAR's brief states that it provided the government with the former employee's email and phone number so DCMA could verify the promised amount (app. reply br. at 20). Yet, that is not proof or evidence. D-STAR has failed to meet its burden of proof that it incurred these costs.

C.    *D-STAR May Not Recover its Costs Incurred Related to ASBCA Appeals*

D-STAR seeks $119,828 in costs incurred between submitting its February 2018 claim and submitting its revised August 2020 claim (R4, tab 38 at 1687-97; app.

30

br. at 2.33; app. reply br. at 19-20).  DCMA asserts that these costs were all incurred in pursuing appeals to the Board or otherwise pursuing its August 2020 revised certified claim (R4, tab 39 at 1815; gov't br. at 55-57).

As noted above, the FAR's cost principles disallow recovery of costs incurred to litigate claims against the government.  FAR 31.205-47(f)(1).  A contractor may not recover "if a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the Government[.]"  *Tip Top Constr.*, 695 F.3d at 1283-84 (Fed. Cir. 2012) (quoting *Bill Strong*, 49 F.3d at 1549-50); *see also Derian*, 23-1 BCA ¶ 38,425 at 186,754.  Here, D-STAR's costs relate to emails sent to the "TCO / Government / ASBCA" (R4, tab 38 at 1687).  D-STAR provides the screen shots of subject-matter lines of the emails and a list of the attached documents to those emails (R4, tab 38 at 1688-95).  Virtually all the email subject-matter lines and the titles of the attached documents explicitly reference ASBCA Nos. 61947 and 62075 (*id.*).

Contrary to D-STAR's assertions, these costs are unrecoverable litigation costs, not recoverable settlement costs related to settling the claims under FAR 31.205-42(g)(1) (app. reply br. at 19).  D-STAR incurred these costs after it filed two appeals with the Board and there is no indication these costs related to settlement.  "Once appellant filed its appeal before us, appellant was involved in an administrative adjudicative proceeding" and any costs pursuing the appeals were unallowable under FAR 31.205-47(f).  *Qualex Int'l*, ASBCA No. 41962, 93-1 BCA 25,517 at 127,090.  Thus, we deny D-STAR's request for these costs.

## CONCLUSION

For the reasons discussed above, we largely sustain DCMA's debt demand claim in ASBCA No. 62075 and award the government $282,926, plus any interest due under FAR 52.232-17 and FAR 32.608-2(a)(1).  We also partially sustain D-STAR's claim in ASBCA No. 62780 and award appellant $16,272.16, plus CDA interest running from when DCMA received D-STAR's February 27, 2018 certified claim when it first sought these costs.  D-STAR's claims are otherwise denied in ASBCA Nos. 62075 and 62780.

Dated:  April 28, 2025

DANIEL S. HERZFELD
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62075, 62780, Appeals of D-STAR Engineering Corp., rendered in conformance with the Board's Charter.

Dated:  April 28, 2025

<span style="display:block; text-align:right;">_for_ Tammye D. Abbott</span>

        PAULLA K. GATES-LEWIS
        Recorder, Armed Services
        Board of Contract Appeals